Keith Sekerke BP1899
Valley State Prism
BV 32-3
P.O. Box 92
Chowchilla, Ca 93610

FILED

Jan 24 2023

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY    s/ shellyy    DEPUTY

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF CALIFORNIA

Keith Sekerke
plaintiff

V.

Adam Arkwright et al
Defendants

No. 20-CV-1045-JO-RBB

PLAINTIFFS MOTION
TO RE-OPEN
DISCOVERY AND
TO APPOINT AN
EXPERT WITNESS

Rule 26(b)(4)(A), Fed. R. Civ. P.
Rule 26(b)(4)(B), Fed. R. Civ. P.

Comes now, Keith Sekerke, plaintiff in pro-se, respectfully and humbly requesting of the Honorable Court to re-open Discovery and to Appoint an Expert Witness.

(1)

Defendants have just sent me a copy of their Expert Disclosures. (EXHIBIT A)

Defendant has just given me of about 200 different people they will rely upon as expert witnesses. All except Two of Them are or were employees in the jail.

I can depose these people if I could afford to do so. I can not. However, I could send them request for admissions and interrogatories, as I've previously requested for.

Some of these expert witnesses are the very same witnesses I have already notified to defense of my own intention to call and I have requested to send them interrogatories.

I also need an expert witness appointed. There are numerous factual questions requiring an expert witness.

I want to point out at a cursory glance of their expert, Dr. C. Hsien Chiery, m.D. has submitted numerous falsivities, lies. I can prove this by showing The court records that contradict Dr. Chiers statements. Records that were provided to me by The defense

( 2 )

In exhibit 'B'y the expert witness disclosures. In the defenses exhibit B of their expert disclosures, a report was written by Dr. Chiang. I have read the report and underlined the text that are Lies, that are false.

I have just sent a request to the prison's medical department to get copies of those records from 2016 at High Desert State Prison and Sierra Neurological medical group.

I specifically remember the visit at that Sierra Neurological medical Group. It was in Reno, Nevada. I remember very distinctly that the specialist I saw told me that surgery would be a risk and either way would not solve the pain. He wrote on the paper that he recommend the prison provide pain management medication. That is when I was started on Morphine 15ms. B.I.D. and Lyrica 150mg B.I.D. I was a prisoner!! My Methamphetamine use was cleared not an issue. My meth and drug usage did not prevent that specialist and the prison doctor from prescribing pain meds because I needed it for serious reasons.

( 3 )

I have been on opiate pain managent ever since. I need some time to wait on these records from the prison.

No prison Doctor, knowing prisoners are drug users, would prescribe morphine to treat chronic pain if it were not medically necessary.

Dr. Chiang, under motivation of financial gain by the defendants and at tax payer expense has written many, many false statements. I've underlined every lie that I know off hand that is a lie.

My own (exhibit B) is my MRI from 2020 while I was an inmate at the San Diego County Jail. The jail doctors ordered that I go to UCSD and have an MRI and so did the specialists they sent ~~there~~ me to.

The MRI clearly shows my severe and serious condition. On the back side under "Impression" it specifically states that there is CONTACT and INDENTATION of the ventral cord. In Dr Chiang (the expert hired by the defendants, he states that a physical exam revealed no evidence of nerve impingement. I underlined it as it is a lie. Sierra Nevada Group Specialist had my MRI there while I was seeing him.

(4)

I need time to obtain these records. I also need leave by the court to reopen discovery and modify the scheduling order please.

(Exhibit C) is my exhibit from UCSD that I visited while I was a prisoner at the jail at the end of 2019. The jail Doctors sent me to see the neurosurgeon. Their concern was possible re-occurance of hydrocephalus. You can see on this exhibit that UCSD medication records shows I was on Hydrocodone-Acetaminophen (vicodin).

The defendants are trying, falsely, to paint me as a drug addict who has obtained opiates from doctors on false pretenses. I can call them liars until I'm blue in the face, but it is easier to just prove them wrong and prove them to be liars.

On the defenses exhibit B9 I underlined where Dr Chiang stated I was receiving narcotic pain medication from 2 different providers. That is not what happened. I sustained an injury at work. I went to the emergency Department. I was given morco

in addition to my chronic pain management schedule for a brief couple weeks. That is perfectly legal and medically necessary.

Dr. Chiang states I returned 4 more times monthly on exhibit B9. Yes, I have to. Because of the Nations opioid epidemic there are very strict rules. One of those rules is that I (a patient) has to be seen monthly and the prescription is only allowed to be prescribed monthly. I HAVE to go back monthly. The physician reviews my condition monthly too.

Also, I did get the MRI done. I remember taking the trolley to a place past Alvarado Hospital. I don't remember the name of the place but I'm certain Medi-Cal will have record of the MRI since they paid for it. Again, another lie by this paid "professional".

I am going to prove this Dr Chiang to be a paid Liar.

My pain management office not only just saw me every month, they drug tested me every month too!! Every visit I

(6)

got drug tested right there in their office. Another Rule. Not only was I drug tested by the Doctors, I was being drug tested by Probation. But, this paid Liar conveniently left out that part.

Upon reading BIO, my intake into the jail are more underlined lies. I never said I was on "other opiates", as I told the jail I was on morphine and lyrica. I wanted the jail to continue my treatment. I even signed a medical release of information to my pharmacy (Allen pharmacy) so the jail could see proof of my current medications.

I never said Seroquel either! And I most certainly did NOT deny having any medical provider. That Lie does not even make sense since I needed the jail to continue my medications.

I had 2 brain surgeries in 2008 at UCSD (see exhibit D highlighted). I had a V.P. Shunt procedure. The Shunt was removed in 2008 too. So, more statements by this paid Liar that are trying, pitifully, to paint me as a Liar.

It is worth noting that Dr. Chiang is a Liar

(7)

I DID INFACT have MRSA. I contracted the MRSA From UCSD after my First brain surgery. That is why the shunt was removed in April 2008. I was then transfered From UCSD to Alvarado Hospital where I spent 2½ months fighting for my life because the MRSA was in my blood and spread to my organs.

I can also obtain these records from CDCR because I was a prisoner at Donovan during all of this. I was under the care of Dr. Haddad at Alvarado, the infectious disease specialist and Dr. Richard Butcher.

I remember the names and dates very well because I almost DIED from the MRSA.

This Dr Chiang is a paid Liar!

I'm going to skip the rest of the lies to page B19. I can not wait to get all the records I need to refute this paid Liar.

Right now, I have just a few. (Exhibit B) is my MRI. It was taken May 20, 2020 while I was in the jail. So, that in itself clearly proves This Dr Chiang false. Also, (Exhibit D) proves page B20 at the top, a Lie. I underlined it. But, I will re-write what the defendants used tax payer money to hire and report

( 8 )

False Statements. Dr Chiang wrote under penalty of perjury, that "He also had multiple specialists documenting and informing him that there were no objective findings of any neck or head injury Necessitating chronic use of opioid Medications"

My (exhibit D) proves this to be a very bold Lie and I formally request Sanctions to be placed on this witness by the defendant. I request that the Court Strike out this witness's report from the record.

I need discovery re-opened and an expert witness appointed of my own for my case.

I Just received this expert disclosure from the defendant and have been surprised by the amount of people. I need discovery re-opened to serve interrogatories, request for admissions and documents upon these witnesses.

I have proven many false statements with the records I have right now on hand. (Exhibits B, C, and D)

This all warrants the need to re-open discovery.

(9)

Additionally, being a pro-se prisoner, I made the mistake thinking I could serve interrogatories at any time. I did not know I had to reopen discovery until now.

The defendants told me discovery is closed and refused to answer or respond to my recently sent interrogatories and request for production of documents.

Clearly there are many very difficult medical and mental health issues that require an expert witness. Please appoint me an expert witness. On page 820 He is confusing my neck pain from hanging myself with my chronic care.

I swear under penalty of perjury the foregoing is true and correct.

_____
January 10th, 2023
Date

_____
Keith Sekerke
plaintiff

(10)

# EXHIBIT  A

Description of this Exhibit   _Defendants expert disclosures_
_with exhibit B of that_
_disclosure. I removed exhibit_
_A of their disclosure as it was_
_too many pages to copy_

Number of Pages   _____

CLAUDIA SILVA, County Counsel (SBN 167868)
By JENNIFER M. MARTIN, Senior Deputy (SBN 322048)
    ALEXA KATZ, Senior Deputy (SBN 317968)
Office of County Counsel, County of San Diego
1600 Pacific Highway, Room 355
San Diego, California 92101-2469
Telephone:  (619) 531- 4901
E-mail: jennifer.martin2@sdcounty.ca.gov

Attorneys for Defendant Lt. Adam Arkwright

## IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Keith Wayne Sekerke, | No. 20cv1045-JO-RBB |
| Plaintiff, | **DEFENDANT LT. ADAM ARKWRIGHT'S EXPERT DISCLOSURES** |
| v. | |
| Adam Arkwright, Sheriff Lieutenant; Aguirre, Deputy Sheriff; Chris Cross, Deputy Sheriff, | **[FRCP Rule 26(a)(2)(A)]** |
| Defendants. | |

Defendant Lt. Adam Arkwright ("Defendant") submits his Expert Witness Disclosure. Defendants reserves the right to provide supplement this disclosure, including disclosing experts under Rule 26, and to produce supplemental reports upon the completion of discovery in this matter.

**Retained Experts:**

**1. Dominick Addario, M.D.**

Dr. Addario's Rule 26 Report is attached to this disclosure and incorporated by reference as EXHIBIT A.

**2. C. Hsien Chiang, M.D., FACC, CCHP-P**

Dr. Chiang's Rule 26 Report is attached to this disclosure and incorporated by

reference as EXHIBIT B.

**Person(s) Who May Present Evidence Pursuant to FRCP, Rules 702, 703, 705 But Are Exempt from Disclosure Under Federal Rules of Civil Procedure, Rule 26(a)(2)(B):**

The following persons are non-retained experts who, under Rule 26(a)(2)(C), are not required to produce reports and will be called upon to present testimony under Federal Rules of Evidence 702, 703, or 705 on areas that reflect specialized training and experience, observations, conduct, and analysis as it may pertain to Plaintiff's claims and the event giving rise to Plaintiff's claims:

**1. Darren Scott Bennett**

Summary of Expected Testimony:

Contact through County Counsel.  Mr. Bennett is a Sheriff's Project Manager with the County of San Diego.  He is expected to testify regarding maintenance issues and the amount of noise in the cells in which Plaintiff was housed.  He may also testify in rebuttal to any expert called by Plaintiff in his areas of expertise.

*Plaintiff's treating medical/psychiatric providers while in the San Diego County Jail:*

**2. Jamson Abella (RN)**

**3. Margaret Aber (LVN)**

**4. Olivia Abrego**

**5. May Adraneda (Sheriff's Detentions Nurse)**

**6. Anthonny Adraneda (RN)**

**7. Jesus Agustin (RN)**

**8. Kimberly Alcaid (RN)**

**9. Jennifer Alonso (MHC)**

**10.Travis Anderson (SRN)**

**11.Shanda Angioli (Psychologist)**

**12.Andy Apsay (Sheriff's Detentions Nurse)**

2

13. Rene Arce (RN)

14. Yvonne Arce (RN-MCG)

15. Rodel Arquero (RN)

16. Emmylou Arroyo (RN MCG)

17. Catherine Banguilan (LVN)

18. Marissa Barlisan (RN)

19. Reginald Barreto (RN)

20. Jameelyn Barrera (RN)

21. Maria Bautista (OA)

22. Rizalina Bautista (RN)

23. Zaldy Benos (LVN)

24. Matthew Berlin

25. Melinda Bernaldez (RN)

26. Omar Bissar

27. Margarita Bonaparte (OA)

28. Oscar Brian Catillo (NP)

29. Christopher Brown

30. Justin Brown (HIM)

31. Sherill Buena (LVN)

32. Milissa Burns (RN)

33. Tanita Butler

34. Michelle Byrd

35. Raquel Cabrera (Sheriff's Detentions Nurse)

36. Joe Cagayo (RN)

37. Avelino Canlas

38. Krystal Carter (D.O.)

39. Keri Cavallo (NP)

40. Clarissa Cawagas

1      **41. Emily Chow**

2      **42. David Christensen (MD)**

3      **43. Olga Cirlugea**

4      **44. Cristina Clongs (SRN)**

5      **45. Vera Cordova**

6      **46. Karen Cruz (RN)**

7      **47. June Cuaresma (RN)**

8      **48. Gabrielle DeGuzman (Sheriff's Detentions Nurse)**

9      **49. Esperanza DeGuzman (Pharmacy Technician)**

10      **50. Larry DeGuzman (RN)**

11      **51. Romeo DeGuzman (RN)**

12      **52. Janet DeJulio (OA)**

13      **53. Angelito Dela Cruz (NP)**

14      **54. Rose Domingo (MRT)**

15      **55. Christopher Dominguez (RN)**

16      **56. Crystal Durden (LMHC)**

17      **57. Estela Durola (RN)**

18      **58. Amanda Dutton (Psychologist)**

19      **59. Carina Echon (RN)**

20      **60. Kristian Ednacot (RN)**

21      **61. Arlene Edusada (Sheriff's Detentions Nurse)**

22      **62. Doreen Egerer (RN)**

23      **63. Ria Encarnacion (LVN)**

24      **64. Shirley Equipado**

25      **65. Crystal Escalante (RN)**

26      **66. Lea Escobar (OA)**

27      **67. Dennis Eusebio (RN)**

28      **68. Archie Eustaquio (Sheriff's Detentions Nurse)**

69. Joji Evangelista (CRN)

70. Christine Evans

71. Christina Farrington (MHC)

72. Cesar Felarca (Sheriff's Detentions Nurse)

73. Peter Freedland (Medical)

74. James Fix (Psychologist)

75. Ryan Fullenwiley-Jones (RN)

76. Dulce Garcia

77. Ronald X Gatan (NP)

78. Vicente Gatan

79. Vincent Gawek (Sheriff's Detentions Nurse)

80. Macy Germono (RN)

81. John Gill (MD)

82. Louis Gilleran (MD-MCG)

83. Carolyn Godman (Psychologist)

84. Julia Guanga (LVN)

85. Jayla Hadley (RN)

86. Mayra Hall (RN)

87. Eileah Hallisy

88. Branden Hasenstab (RN)

89. Katelyn Hendricks (RN)

90. Emilio Herrera-Gardea (RN)

91. Terri Hildreth (LVN)

92. Bethany Higgins (LVN)

93. Julie Ann Hilario (Sheriff's Detentions Nurse)

94. Terri Hildreth (LVN)

95. LeAndra Holland (Chief MHC)

96. Joe Hong (Psychiatrist)

5

97. Marylene Ibanez (RN)

98. Nadia Ibarra (OA)

99. Kevin Irwin (Sheriff's Detentions Nurse)

100. Mian Jan (Psychiatrist)

101. Maria Javier (RN)

102. Casey Johnson

103. Christopher Kagay (NP)

104. Esther Kagha (NP)

105. Amber Kaggie (Psychologist)

106. Lulu Karram (Sheriff's Detentions Nurse II)

107. Nestor Kensinger (LMHC)

108. Alex Kettner

109. Anil Kumar (Sheriff's Detentions Nurse)

110. Collin Laing (RN)

111. Brandon Lamm (Sheriff Deputy)

112. Michael Langley-Degroot

113. Angelica Lazaga (OA)

114. Arim Jayne Lee (NP)

115. La Cresheia Lee (MHC)

116. Arturo Leon (Medical)

117. Michael Limon (RN)

118. Aileen Longno (RN)

119. Marla Lopez (RN)

120. Mariel Lora (RN)

121. Krystal Lott (NP)

122. Meghan Lukasik (Psychologist)

123. Emily Lymburn (RN)

124. My Lynn (Phlebotomist)

No. 20cv1045-JO-RBB

125. Samantha Macanlalay (Sheriff's Detentions Nurse)
126. Liza Macatula (Supervising Nurse)
127. Claudette Magno (RN)
128. Magdalina Malicdem (RN)
129. Lorelie Manaig (RN)
130. Ronald Marquez (RN)
131. Mauricio Martinez (Medical)
132. Levi Martinez
133. Stephanie Martinez
134. Leonardo Mendoza (RN)
135. Alejandro Meruelo
136. Judith Meyers
137. Jonathan Miller (MHC)
138. Jennifer Monteclar (Office Assistant)
139. Mary Montelibano (RN)
140. Michelle Napolitano-Lang (RN)
141. Ariana Nesbit
142. Tatiana Neumann (DO)
143. Oyenoghani Obuseh (LVN)
144. Adaeze Okoh (RN)
145. Liza Operana (LVN)
146. Christine Padilla (RN)
147. Rex Padilla (SRN)
148. Ciani Palencia (Sheriff's Detentions Nurse)
149. Loraine Palmeda (LVN)
150. Mijung Park (HIM)
151. Deborah Parrish (RN)
152. Danalee Pascua (RN)

No. 20cv1045-JO-RBB

153. Reinan Paulino (RN)

154. Aaron Pavao (RN)

155. Kelli Payne (RN)

156. Dominga Phelps (RN)

157. Justin Polanco (Dentist)

158. Doonpinich Pongsuriyachai (RN)

159. Sonja Proctor (LMHC)

160. Cynthia Purviance (Medical)

161. Edmon Pusung (RN)

162. Brandy Rafail (SRN)

163. Nas Rafi (MD)

164. Mieko Ransome (LVN)

165. Stephanie Rappley (RN)

166. Veronica Rayo (LVN)

167. Crystal Reeves (MCH)

168. Imelda Robeniol (RN)

169. Carrie Romero (RN)

170. Analiza Roxas (LVN)

171. Serina Rognlien-Hood (Supervising Nurse)

172. Kathy Rose (MHC)

173. Maria Rose (MCG)

174. Gene Sabangan (LVN)

175. Christina Salazar (Chief MHC)

176. John Samanieg (Sr. HIM Tech)

177. Ben Samonte (RN)

178. Paul Santella (RN)

179. Daniel Santos (RN)

180. Ma Krizel Santos (RN)

8

181. **Ernst Schettini (RN)**

182. **Jared Shiflet (RN)**

183. **Phyllis Smerud (Psychologist)**

184. **Charmaine Solmerano (RN)**

185. **Fidel Soriano**

186. **Irma Sterling (RN)**

187. **Kebreab Teklegiorgis (RN)**

188. **Jeremy Tibai (RN)**

189. **Edgar Timpug (LVN)**

190. **Liberty Tolentino (CRN)**

191. **Kellie Truesdale**

192. **Melissa Turner (MHC)**

193. **Christopher Tucker (RN)**

194. **Maria Ugaban (RN)**

195. **Maxima Valbuena (LVN)**

196. **Jonathan Velasquez**

197. **Noel Villarta**

198. **Friedrike Von Lintig (Medical)**

199. **Chantel Williams (RN)**

200. **Lizzie Womack (SRN)**

201. **Frederick Wycoco (NP)**

202. **Stephanie Yee (RN)**

203. **Francis Ysla (Psychiatrist)**

Summary of Expected Testimony:

Contact through County Counsel.  These individuals are medical providers who observed and provided treatment to Plaintiff while in San Diego County custody from 2018 through 2021.  They will testify as to their observations, diagnosis, and treatment of Plaintiff.  This includes their notes, charts, observations, practices surrounding the

1  medical notes and entries made by these individuals, are contained in the previously
2  produced medical records.  They are expected to testify as to the existence and causation
3  of damages claimed by Plaintiff in this action, as described by plaintiff in his discovery
4  responses and his deposition.

5     **204.  Lt. Adam Arkwright**
6  Summary of Expected Testimony:

7        Lt. Arkwright will offer testimony concerning his specialized knowledge regarding
8  the Jail Population Management Unit and its practices.  This includes classification
9  processes and practices in 2018-2021 and earlier at the San Diego Central Jail, the
10  meaning and criteria for the classification levels and the propriety of Plaintiff's
11  classification and placement into Ad-Seg.  He is expected to offer testimony regarding
12  the governmental interests supporting the policies, practices and procedures involved in
13  this litigation.   He is expected to testify as to the grievance procedures at the San Diego
14  Central Jail and whether or not plaintiff followed those procedures.  He is also expected
15  to testify to the availability of those grievance procedures. He may also testify in rebuttal
16  to any expert called by Plaintiff in his areas of expertise

17     **205.  Sgt. Lawson**
18     **206.  Sgt. Terry Jackson**
19  Summary of Expected Testimony:

20        Contact through County Counsel.  Sheriff's Sergeants with the County of San
21  Diego.  They will offer testimony concerning his specialized knowledge regarding the
22  Jail Population Management Unit and its practices.  This includes classification processes
23  and practices in 2018-2021 and earlier at the San Diego Central Jail, the meaning and
24  criteria for the classification levels in the CDCR and SDSO, and the propriety of
25  Plaintiff's classification and placement into Ad-Seg.  They are expected to offer
26  testimony regarding the governmental interests supporting the policies, practices and
27  procedures involved in this litigation.  They will testify as to the nature of Administrative
28  Segregation, its purpose, and other types of housing that are and are not available in the

jail system.  They will testify, as needed, on Sekerke's institutional history, housing requirements and their basis, security risks, and policies and procedures concerning classification.  They may also testify in rebuttal to any expert called by Plaintiff in his areas of expertise.

**207.  Gagliardi**

**208.  EO. Quinn**

**209.  J. Page**

**210.  W. Renner**

**211.  P. NeSmith**

**212.  J. Monti**

**213.  A. Elizalde**

**214.  N. Crist**

**215.  R. Flores**

**216.  R. Cantu**

**217.  B. Bumbasi**

**218.  C. Sanchez**

**219.  F. Leon**

**220.  B. Stubbs**

**221.  A. Castorena**

**222.  E. Wilt**

**223.  J. Swiney**

**224.  J. Vickers**

**225.  L. Garcia**

**226.  D. Legler**

**227.  F. Rodriguez**

**228.  L. McKelley**

**229.  N. Santillanes**

**230.  F. Bravo**

11

**231.  R. Klindt**

**232.  D. Olsen**

Summary of Expected Testimony:

Contact through County Counsel.  These individuals conducted classification reviews of Plaintiff.  They are expected to testify regarding the classification process, review and placement of inmates in housing at San Diego Central Jail.  They will testify as to the nature of Administrative Segregation, its purpose, and other types of housing that are and are not available in the jail system.  They will testify, as needed, on Sekerke's institutional history, housing requirements and their basis, security risks, their decision-making as to Sekerke's housing, and policies and procedures concerning classification.  They may also testify in rebuttal to any expert called by Plaintiff in his areas of expertise.

**233.  Lt. Kelly Buchanan**

**234.  Lt. Stefan Kopchak**

**235.  Lt. Laura Coyne**

**236.  Lt. K. Kamoss**

Summary of Expected Testimony:

Contact through County Counsel.  Lts. Buchanan, Kopchak, Coyne, and Kamoss are Sheriff's Detentions Lieutenants with the County of San Diego.  They are expected to testify as to the housing conditions and routines in the Ad-seg unit and general population units in 2019-2021 and the expectations and standards for the conditions in those units. They are expected to offer testimony regarding the governmental interests supporting the policies, practices and procedures involved in this litigation.  They may also testify in rebuttal to any expert called by Plaintiff in their areas of expertise

**237.  Cpt. Alan Kneeshaw**

**238.  Cpt. Mark Hayes**

**239.  Cpt. Jovin Adamos**

**240.  Cdr. Chris Buchanan**

12

1  <u>Summary of Expected Testimony:</u>

2      Contact through County Counsel. Messrs. Kneeshaw, Hayes, Adamos, and

3  Buchanan are expected to testify as to the configuration of facilities at the San Diego

4  Central Jail and that the implementation / execution of policies at the facility, including

5  compliance with provisions of Title 24 and biennial Title 15 inspections. They are

6  expected to testify as to the grievance procedures at the San Diego Central Jail and

7  whether or not plaintiff followed those procedures. They are also expected to testify to

8  the availability of those grievance procedures. They are expected to offer testimony

9  regarding the governmental interests supporting the policies, practices and procedures

10  involved in this litigation. They may also testify in rebuttal to any expert called by

11  Plaintiff in his areas of expertise.

12      **241.   Gabriel Castro**

13  ///

14  ///

15  ///

16  ///

17  ///

18  ///

19  ///

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

1   Summary of Expected Testimony

2           Contact through County Counsel.  Mr. Castro is a sergeant with the County of San

3   Diego Sheriff's Department.  He is expected to testify as to the interpretation and

4   synthesis of the JIMS records involved in this matter, including housing assignments.  He

5   has specialized knowledge regarding the JIMS systems, data entry processes, and

6   interpretation and meaning of those records.  He may also testify in rebuttal to any expert

7   called by Plaintiff in this area of expertise.

8           **242.   Ernesto Murillo**

9           **243.   Christian Sandoval**

10  Summary of Expected Testimony

11          Contact through County Counsel.  Mr. Murillo is a sergeant and Mr. Sandoval is a

12  deputy with the County of San Diego Sheriff's Department.  They are expected to testify

13  as to the sanitation issues involved in this case.  This includes hygiene and inmate worker

14  issues.  He may also testify in rebuttal to any expert called by Plaintiff in this area of

15  expertise.

16                                          Respectfully submitted,

17  DATED: January 6, 2023                  CLAUDIA SILVA, County Counsel

18                                          By: s/JENNIFER M. MARTIN, Senior Deputy
                                            Attorneys for Defendant Lt. Adam Arkwright
19                                          E-mail: jennifer.martin2@sdcounty.ca.gov

20

21

22

23

24

25

26

27

28

14

No. 20cv1045-JO-RBB

# Exhibit B

**C. Hsien Chiang, MD, FACCP, CCHP-P**
P.O. Box 27935 Anaheim, CA 92809
Phone: 949-625-0938 Fax: 949-625-1038

## I.      INTRODUCTION

My name is C. Hsien Chiang, MD.  My business address is P.O. Box 27935 Anaheim, California 92809.  I was retained by the office of County Counsel on behalf of County of San Diego, to consult in the case of *Sekerke vs. Arkwright*.

My rates for legal consultation are $600 per hour for review and $700 per hour for deposition and/or trial testimony plus travel expenses.

## II.     BACKGROUND AND EDUCATION

I have a Bachelor of Science degree from the University of California, Irvine.  I received my Doctorate of Medicine in 1999 from the Medical College of Wisconsin in Milwaukee.  I have been a licensed Physician and Surgeon in the State of California since 2001.  I am board certified in Family Medicine and Addiction Medicine.  I have worked in health care as a primary care physician for 21 years, and in the field of correctional health care for the last 16 years.

### Professional Experience

I operated a full-time private practice from 2002-2006, while also working part-time in a busy urgent care clinic in Irvine and Newport Beach, California.  After leaving private practice, I was employed by the Health Care Agency in Orange County, California from 2006-2011 as a Staff Physician in the County Jail system.  In March 2011, I was promoted to the position of Medical Director for the Orange County Jail.  In addition to direct patient care, I oversee the provision of medical and mental health services to the adult jail population with an average daily census of approximately 5300, of which between 300-400 on average are considered severely mentally ill.  I also meet regularly with jail administrators and medical directors from several jurisdictions in Northern and Southern California to discuss emerging legislative and health care topics that impact correctional populations and best practices.  I am a volunteer faculty member with the Family Medicine Department at the University of California, Irvine, teaching third-year

EXHIBIT B1

Family Medicine residents, as well as a clinical preceptor for Addiction Medicine fellows from Loma Linda University Addiction Medicine Fellowship.

### Professional Memberships

I am currently a member of the following organizations:

- Western American Correctional Health Services Association
- National Commission on Correctional Health Care
  - Certified Correctional Health Professional-Physician (CCHP-P)
- American College of Correctional Physicians (FACCP) – Fellow
- American Society of Addiction Medicine (ASAM) – Fellow
- California Society of Addiction Medicine (CSAM) – Committee member
- American Medical Association (AMA)

**III.   CASES**

I have testified as an expert in a deposition in the last four years for the following cases:

| | | |
|---|---|---|
| 1. | January 2019 | *Tanner vs McMurray* |
| 2. | March 2019 | *Gasca vs CFMG.* |
| 3. | December 2020 | *Bennett vs PrimeCare* |
| 4. | July 2021 | *Board vs PrimeCare* |
| 5. | November 2021 | *Lowrey vs Braga et. al.* |
| 6. | May 2022 | *Reynolds vs PrimeCare, et al.* |
| 7. | September 2022 | *Medina vs Penzone, et al.* |

I was designated as an expert in the following cases in the past four years:

| | | |
|---|---|---|
| 1. | December 2018 | *Gasca vs CFMG* |
| 2. | December 2018 | *Tanner vs McMurray* |

EXHIBIT B2

Sekerke vs Arkwright
Page **3** of **22**

| | | |
|---|---|---|
| 3. | February 2019 | *Valenzuela vs Gregorio* |
| 4. | March 2019 | *Ceraulo vs DuPage County et. al.* |
| 5. | April 2019 | *Clyde vs Lippert, et. al.* |
| 6. | August 2019 | *Dabbs vs Corizon Health, Inc., et. al.* |
| 7. | October 2019 | *Carter vs Penzone* |
| 8. | March 2020 | *Nichols vs Phillips et. al.* |
| 9. | May 2020 | *Estes vs Sonoma County et. al.* |
| 10. | September 2020 | *Board vs PrimeCare* |
| 11. | October 2020 | *Magallon vs County of Ventura et. al.* |
| 12. | November 2020 | *Bennett vs PrimeCare* |
| 13. | March 2021 | *Siders vs PrimeCare* |
| 14. | May 2021 | *Heather Lowrey vs Christopher Braga, MD, et al.* |
| 15. | August 2021 | *Sekerke vs County of San Diego, et al.* |
| 16. | September 2021 | *Lovelace vs Clark, et al.* |
| 17. | March 2022 | *Medina vs Penzone, et al.* |
| 18. | May 2022 | *Reynolds vs PrimeCare, et al.* |
| 19. | June 2022 | *Garner vs PrimeCare, et al.* |
| 20. | December 2022 | *Garrett vs Comal County, et al.* |
| 21. | December 2022 | *Higgens-Martinez vs CorrHealth LLC., et al.* |

## IV.   **MATERIALS REVIEWED**

In preparation for forming the opinions expressed below, in addition to my experience in the correctional healthcare field, I have reviewed the following materials:

A. 558736C_Keith__Wayne_Sekerke_Valley_State_Prison_-_See_Attachment_Vol_20_of_20 - 280 pages

B. 558736C_Keith__Wayne_Sekerke_Valley_State_Prison_-_See_Attachment_Vol_19_of_20 - 298 pages

EXHIBIT B3

Sekerke vs Arkwright
Page **4** of **22**

   C.  558736C_Keith__Wayne_Sekerke_Valley_State_Prison_-
      _See_Attachment_Vol_18_of_20 - 298 pages

   D.  558736C_Keith__Wayne_Sekerke_Valley_State_Prison_-
      _See_Attachment_Vol_17_of_20 - 298 pages

   E.  558736C_Keith__Wayne_Sekerke_Valley_State_Prison_-
      _See_Attachment_Vol_16_of_20 - 298 pages

   F.  558736C_Keith__Wayne_Sekerke_Valley_State_Prison_-
      _See_Attachment_Vol_15_of_20 - 298 pages

   G.  558736C_Keith__Wayne_Sekerke_Valley_State_Prison_-
      _See_Attachment_Vol_14_of_20 - 298 pages

   H.  558736C_Keith__Wayne_Sekerke_Valley_State_Prison_-
      _See_Attachment_Vol_13_of_20 - 298 pages

   I.  558736C_Keith__Wayne_Sekerke_Valley_State_Prison_-
      _See_Attachment_Vol_12_of_20 - 298 pages

   J.  558736C_Keith__Wayne_Sekerke_Valley_State_Prison_-
      _See_Attachment_Vol_11_of_20 - 298 pages

   K.  558736C_Keith__Wayne_Sekerke_Valley_State_Prison_-
      _See_Attachment_Vol_10_of_20 - 298 pages

   L.  558736C_Keith__Wayne_Sekerke_Valley_State_Prison_-
      _See_Attachment_Vol_9_of_20 - 298 pages

   M. 558736C_Keith__Wayne_Sekerke_Valley_State_Prison_-
      _See_Attachment_Vol_8_of_20 - 298 pages

   N.  558736C_Keith__Wayne_Sekerke_Valley_State_Prison_-
      _See_Attachment_Vol_7_of_20 - 298 pages

EXHIBIT B4

Sekerke vs Arkwright
Page **5** of **22**

O. 558736C_Keith__Wayne_Sekerke_Valley_State_Prison_-
_See_Attachment_Vol_6_of_20 - 298 pages

P. 558736C_Keith__Wayne_Sekerke_Valley_State_Prison_-
_See_Attachment_Vol_5_of_20 - 298 pages

Q. 558736C_Keith__Wayne_Sekerke_Valley_State_Prison_-
_See_Attachment_Vol_4_of_20 - 298 pages

R. 558736C_Keith__Wayne_Sekerke_Valley_State_Prison_-
_See_Attachment_Vol_3_of_20 - 298 pages

S. 558736C_Keith__Wayne_Sekerke_Valley_State_Prison_-
_See_Attachment_Vol_2_of_20 - 298 pages

T. 558736C_Keith__Wayne_Sekerke_Valley_State_Prison_-
_See_Attachment_Vol_1_of_20 - 297 pages

U. 558736B_Keith__Wayne_Sekerke_Valley_State_Prison_-
_See_Attachment_Vol_8_of_8 - 148 pages

V. 558736B_Keith__Wayne_Sekerke_Valley_State_Prison_-
_See_Attachment_Vol_7_of_8 - 148 pages

W. 558736B_Keith__Wayne_Sekerke_Valley_State_Prison_-
_See_Attachment_Vol_6_of_8 - 148 pages

X. 558736B_Keith__Wayne_Sekerke_Valley_State_Prison_-
_See_Attachment_Vol_5_of_8 - 148 pages

Y. 558736B_Keith__Wayne_Sekerke_Valley_State_Prison_-
_See_Attachment_Vol_4_of_8 - 148 pages

Z. 558736B_Keith__Wayne_Sekerke_Valley_State_Prison_-
_See_Attachment_Vol_3_of_8 - 148 pages

EXHIBIT B5

AA.    558736B_Keith__Wayne_Sekerke_Valley_State_Prison_-
_See_Attachment_Vol_2_of_8 - 148 pages

BB.    558736B_Keith__Wayne_Sekerke_Valley_State_Prison_-
_See_Attachment_Vol_1_of_8 - 146 pages

CC.    558736B_Keith__Wayne_Sekerke_Valley_State_Prison_-
_See_Attachment_Vol_5_of_5 - 281 pages

DD.    558736B_Keith__Wayne_Sekerke_Valley_State_Prison_-
_See_Attachment_Vol_4_of_5 - 283 pages

EE. 558736B_Keith__Wayne_Sekerke_Valley_State_Prison_-
_See_Attachment_Vol_3_of_5 - 283 pages

FF. 558736B_Keith__Wayne_Sekerke_Valley_State_Prison_-
_See_Attachment_Vol_2_of_5 - 283 pages

GG.    558736B_Keith__Wayne_Sekerke_Valley_State_Prison_-
_See_Attachment_Vol_1_of_5 - 281 pages

HH.    CSD1-4709 Complete Medical Records 4709 pages

II.    Pages from Pltff Responses to ROGs, Set One - 1 page

JJ.    #22 Order on Defendants Motion to Dismiss - 27 pages

KK.    SEKERKE, KEITH WAYNE 09-21-2022_full 221 pages + Exhibits 531 pages

LL.    Deposition transcript of Mr. Sekerke on 07-07-21 (286 pages) + exhibits (560 pages)

MM.    #8 FAC - 13 pages

## V.    <u>**SUMMARY OF MATERIALS REVIEWED**</u>

### <u>*Pre-October 2018 Summary*</u>

EXHIBIT B6

Sekerke vs Arkwright
Page 7 of 22

Mr. Sekerke had a long history of substance use disorders and maladaptive, antisocial behaviors. According to his account, his substance use began around age 13 and he lived most of his adult life in and out of correctional facilities. In his testimony, he reported abusing methamphetamine most of his adult life daily when he has access, with only brief (3-4 month) periods of abusing marijuana when he is not abusing methamphetamine (Sekerke 47:7-14).

According to mental health records from San Diego Jail (SDJ) and California Department of Corrections and Rehabilitation (CDCR) records dating back to 2004, Mr. Sekerke had a long history of antisocial personality disorder with borderline and narcissistic traits and substance use disorders. In assessments by mental health professionals, they consistently assessed Mr. Sekerke to have poor insight and judgment and externalized blame. Some examples of his maladaptive behaviors from multiple CDCR Psychology evaluations in 2008 and his own testimony include:

- *"Inordinately focused on gaining medical treatment for his perceived medical problems... due to his [personality disorders] he successfully self-sabotages"*.
- *"Articulate speech...entitled demeanor...took pride in how he was able to manipulate custody staff"*
- *"He has energy and intelligence to pursue lengthy legal battles and such actions energizes him"*.
- *"[I smoked marijuana] in the law library in George Baily... I had [deputies] convinced it was the counselors, and they went and raided the counselors' office. That was fun"*

In 2008, Mr. Sekerke underwent brain surgery for an arachnoid cyst and increased fluid in his brain (hydrocephalus) and had 2 separate surgeries, one to remove the arachnoid cyst and place a ventriculoperitoneal (VP) shunt and another for the removal of the VP shunt a month later due to MRSA infection. According to his testimony, this was the period that he began using opioid medications to control chronic pain in his neck.

On September 2, 2016, Sierra Neurosurgery Group evaluated Mr. Sekerke through High Desert State Prison for the complaint of neck pain and arm numbness, and tingling at night. He

EXHIBIT B7

Sekerke vs Arkwright
Page 8 of 22

claimed, "he was told he needed surgery but went to prison so only managed with pain medication". A physical exam revealed no evidence of nerve impingement. Surgery was not recommended at this encounter nor were opioid medications. Instead, spinal epidural injection and physical therapy were recommended.

On June 29, 2017, Mr. Sekerke was evaluated for a complaint of scabbed sores and rashes on his face by CDCR health care staff.

On August 10, 2017, Mr. Sekerke was evaluated for a complaint of a rash by CDCR health care staff.

On September 15, 2017, shortly after his release from CDCR, Mr. Sekerke initiated the first of 13 total health care visits with Family Health Centers (FHC) of San Diego. The purpose of these health encounters was for pain management of his chronic neck pain and to continue his narcotic prescription of Morphine twice a day. Throughout all the 13 FHC visits, Mr. Sekerke did not truthfully disclose to the health care providers that he, in fact, had a long-standing history of substance use disorders.

From the beginning of these encounters in September 2017, FHC was clear in their documentation that Mr. Sekerke was being referred to a pain management specialist for the management of his pain medications and that FHC was only refilling his medications as a "bridge" until he was connected to pain management. Despite this, Mr. Sekerke did not have his initial contact with the pain medicine clinic until 5 months later, on February 19, 2018. Additionally, FHC also referred Mr. Sekerke to physical therapy, but Mr. Sekerke never attended any physical therapy sessions as recommended.

On February 19, 2018, Mr. Sekerke was evaluated by Dr. Qian, a board-certified physical medicine and rehab (PM&R) specialist. The following were notable during this encounter:

- The exam was completely unremarkable for any cord compression signs or symptoms.
- Mr. Sekerke again did not truthfully disclose his long-standing history of illicit drug use. According to Dr. Qian's documentation, "*he has never used any illicit drugs*."

EXHIBIT B8

Sekerke vs Arkwright
Page 9 of 22

- At the time of the encounter, in February 2018, Mr. Sekerke was receiving narcotic pain medications from 2 different providers. The morphine from FHC and hydrocodone (Norco) from a work injury physician for a work-related injury that occurred in January 2018.
- Dr. Qian stated he would *"need more data to determine if the potential [continuous opioid therapy (COT)] therapeutic benefits outweigh the potential harms."*
- MRIs and x-rays were ordered to help establish a diagnosis.
- Dr. Qian recommended cervical epidural injections as first-line treatment.

Mr. Sekerke did not return to the pain management clinic as recommended. Instead, he returned to FHC 4 more times between March and mid-May for continued "bridging" of his opioid pain medications. He falsely reported to FHC that pain management was awaiting records of his recent MRI, even though he never went to complete the MRI. At some point during this time frame, his morphine was increased to 3 times a day.

On June 4, 2018, Mr. Sekerke returned to the pain management clinic and was evaluated by a physician assistant (PA) Paquet. This was the first time PA Paquet evaluated Mr. Sekerke. No additional clinical data was elicited to determine the risks/benefits of COT and Mr. Sekerke had not completed his MRI as recommended, even though it was approved 4 months prior in February 2018. Mr. Sekerke's morphine prescription was maintained on a frequency of 3 times per day and a 30-day supply (90 tablets) was prescribed.

Mr. Sekerke returned to Dr. Qian's pain management clinic 4 more times monthly. In each of those encounters, except for the last encounter on September 24, 2018, Mr. Sekerke was evaluated by a new PA or Nurse Practitioner (NP) that had never met Mr. Sekerke previously. During this time frame, Mr. Sekerke never completed the MRI that was recommended nor did he attend PT. The PAs and NP supervised by Dr. Qian all continued to refill his opioid prescriptions of 90 tablets per month during those encounters without questioning his compliance with prior recommendations. It's worth noting that Dr. Qian's medical license was suspended and sanctioned by the California Medical Board for falsely advertising himself as board-certified

EXHIBIT B9

in pain management and forbidding him from supervising any NPs or PAs. *when was that?*

### *San Diego County Jail Summary- On and after October 2018*

On October 12th, 2018, at approximately 2:35 AM, Mr. Sekerke was brought to San Diego County Jail (SDJ). During Medical Intake, Mr. Sekerke's blood pressure was 127/88, the temperature was 98.5, pulse was 100, respiration was 18, his height was 5' 10" and weight was 175 lbs., giving him a body mass index of 27.4. He was noted to be in no acute distress, alert, and responsive to questions. He denied alcohol and drug use. He also denied any impairments with mobility, vision, or communication. He walked into the intake area without any assistance or difficulty. On medical history, Mr. Sekerke reported that he had 2 brain surgeries and Barrett's esophagus. On psychiatric history, Mr. Sekerke reported he was diagnosed with schizoaffective bipolar disorder. Regarding medications, he reported allergies to Toradol, Lamictal, and Doxycycline and reported his current medication list as morphine, other opiates, Seroquel, and Wellbutrin, although he denied having a current health care provider.

Following the Medical Intake, Mr. Sekerke was evaluated by a Registered Nurse (RN). During the evaluation, it was noted that Mr. Sekerke was verbally abusive during this interaction. He reported that he took opiates and morphine for chronic pain. He also reported having had 2 brain surgeries for cysts in his brain and that he had a shunt in his head. This RN noted a scar on the back of his scalp. He also reported that the last time he was in jail he had uncontrolled bowel movements due to withdrawals. At the time of this evaluation, he denied any withdrawal symptoms. Although Mr. Sekerke did not disclose any history of a seizure disorder, a review of his prior jail medications by the RN indicated that he had been treated with a medication that may be used to control psychiatric or seizure conditions. The RN referred Mr. Sekerke for seizure screening and opiate withdrawal to be initiated during second-floor screening.

At approximately 11:08 AM, Mr. Sekerke was evaluated by RN for second-floor screening. During this evaluation, his blood pressure was 120/80, respiration was 17, pulse was 80, and temperature was 97.5. He reported having Barrett's esophagus and that he took opioid medications for pain management. Mr. Sekerke also claimed that an abrasion on his neck was

EXHIBIT B10

Sekerke vs Arkwright
Page 11 of 22

infected with Methicillin-Resistant Staphylococcus Aureus (MRSA). It is worth noting that prior to incarceration, he had never sought treatment for the neck abrasion and had never been diagnosed by a medical provider with MRSA infection of this abrasion. According to jail health records, Mr. Sekerke appeared angry, but otherwise was not exhibiting any signs of grimacing, guarding, or any other distress from pain. He was started on medications to address opioid withdrawal symptoms that may follow and for muscular strain.

At approximately 11:23 AM Mr. Sekerke's Chest X-Ray (CXR) reading as reported by the radiologist was within normal limits, with no reports of any other abnormalities.

On October 13, 2018, at approximately 2:43 PM, Mr. Sekerke was evaluated by an advanced practice provider per the referral from a day earlier. The neck wound was described as an abrasion with a slight scab with no redness or drainage. Mr. Sekerke was placed on omeprazole for the history of Barrett's esophagus while awaiting outside records documenting this, and Bactrim DS for 7 days to address the neck abrasion. His withdrawal symptoms were noted to be "stable".

On October 15, 2018, Mr. Sekerke submitted 2 separate health care requests, one for "Continuity of care, MRSA, pain management", and the other for "mental health care".

The next day on the morning of October 16, 2018, an RN assessed Mr. Sekerke for his health care request. Despite having no mobility issues during intake, he now claimed that he could not go to court due to his feet being swollen from a self-diagnosed MRSA infection. He *Never was* appeared anxious and was using a wheelchair. It was unclear to this RN why he was in a *I in a wheelchair* wheelchair. He requested the RN to place him on morphine and Lyrica. He also requested to be placed on Ibuprofen even though he claimed to have an allergy to Toradol. Both Ibuprofen and Toradol belong to the same class of medications known as non-steroidal anti-inflammatory drugs (NSAIDs). Due to this, the RN offered Mr. Sekerke Acetaminophen for pain, which is not an NSAID. He declined it claiming it would not work.

The following day, on the afternoon of October 17, 2018, Mr. Sekerke was evaluated by a physician, Dr. Leon. Mr. Sekerke requested to be prescribed Lyrica and morphine for pain

EXHIBIT B11

Sekerke vs Arkwright
Page **12** of **22**

management from a spine injury. During this visit, Mr. Sekerke became upset when he learned that he would not be receiving narcotics and Lyrica. Mr. Sekerke also requested Ibuprofen, which the physician denied due to concern of cross-reactivity with Mr. Sekerke's self-reported allergy to Toradol, which is also an NSAID.

Shortly after evaluation by the physician, Mr. Sekerke was evaluated by psychiatry. According to the psychiatry note, <u>Mr. Sekerke was arrested for possession of a narcotic</u> *NO I WAS NOT* <u>controlled substance</u>. His adherence to his regimen of Trileptal, Wellbutrin, and Buspar had been poor due to multiple flash incarcerations. Mr. Sekerke acknowledged that he was struggling with drug addiction. Methamphetamine was his drug of choice and his route of use was injection. He reported having had 2 brain surgeries for VP shunt and denied having a seizure disorder. Trileptal, Wellbutrin, and Buspar were ordered to be restarted.

On October 19, 2018, Mr. Sekerke filed 2 grievances. In one, he claimed to have *(my right ankle)* contracted MRSA from the jail. In the other, he claimed to be denied adequate medical treatment for his serious medical needs, which he described as severe debilitating chronic pain from cervical and spinal stenosis and scoliosis. <u>It is worth noting that Mr. Sekerke's CXR during intake did not report any abnormal curvatures of his spine.</u>

Over a 5-day period from October 21 to 25, 2018, Mr. Sekerke submitted 5 additional grievances. One grievance for mobility issue related to an infection on his right ankle; One grievance for not receiving a replacement asthma inhaler for one day; One grievance for not having a double mattress inmate accommodate slip known as a chrono; Two grievances claiming he was being denied adequate medical care because he was not receiving opioid medications for pain. Mr. Sekerke filed more than 300 separate grievances during his incarceration at SDJ. Most of these grievances claimed inadequate medical treatment and/or deliberate indifference. These claims mostly arose from not receiving opioid medications which <u>he perceived was the only adequate treatment for his chronic pain.</u>

In the early morning hours of October 25, 2018, Mr. Sekerke was placed into Inmate Safety Program due to concerns about his dangerous behavior related to the destruction of jail

EXHIBIT B12

Sekerke vs Arkwright
Page **13** of **22**

property by using a restraint chain to break glass in a cell.

Later, that morning on October 25, 2018, he was reevaluated by a physician for his chronic pain complaints and right ankle ulcer. The physician's documentation noted that his right ankle ulcer was healing and being treated with Bactrim and that the use of opioid medications including Methadone was not indicated for chronic non-malignant pain.

The same afternoon on October 25, 2018, Mr. Sekerke was evaluated by a psychologist. The psychologist's documentation noted that Mr. Sekerke had a history of drug-induced organic affective disorder, schizoaffective disorder/bipolar type, and substance use disorders including alcohol, cocaine, and other stimulants. For work or income, Mr. Sekerke reported living off a recent lawsuit settlement.

While in court on October 29, 2018, Mr. Sekerke complained of chest pain. In response, paramedics were summoned and he was transferred directly from the court to UCSD Emergency Department (ED) for evaluation. Mr. Sekerke reported to the ED physician that he had severe chest pain for approximately 30 minutes and that he hit his forehead while at court. Oxycodone, acetaminophen, and nitroglycerin were administered to Mr. Sekerke for his pain. A cardiac workup revealed no abnormalities and a CT scan of his head and cervical spine did not reveal any significant abnormalities. Mild degenerative changes at C3/4 were unchanged from prior CTs, which were not clinically significant findings. He was discharged back to jail.

On the morning of November 2, 2018, a physician re-evaluated Mr. Sekerke and determined that his right ankle wound had healed and discontinued daily wound care treatments. Later that afternoon, Mr. Sekerke was re-evaluated by a psychiatrist. Mr. Sekerke reported having poor sleep and requested a trial of antipsychotic medication to address auditory hallucinations. A trial of Zyprexa was ordered. Mr. Sekerke later denied ever being on Zyprexa in his testimony (Sekerke 125:7-20). Of note, anti-psychotic medications have powerful sedating side effects.

On the evening of November 5, 2018, during RN encounters, Mr. Sekerke claimed that he had severe pains in his neck from cervical stenosis and was on a pain management program.

EXHIBIT B13

The RN noted that Mr. Sekerke was not in any distress and was able to ambulate. *The jail nurse Lied, see Sekerke v. Lev*

On November 8, 2018, Mr. Sekerke was evaluated by a physician as ordered by the court. The physician noted Mr. Sekerke's complaint of chronic neck pain but noted that Mr. Sekerke was not displaying any objective signs of pain and was able to walk without difficulty. A cervical X-ray and an extra mattress were ordered. The cervical X-ray was completed the same morning and reported no anatomical abnormalities.

On November 14, 2018, Mr. Sekerke was seen by RNs on multiple occasions. Initially for requesting a wheelchair due to pain. Later he was seen for high blood pressure and chest pain. During these encounters, his blood pressure was 181/87, his pulse was 136 and he appeared anxious with rapid speech. A 12-lead electrocardiogram (ECG) was performed. Other than tachycardia (fast heart rate), there were no signs of cardiac injury on the ECG. This episode of rapid speech, acute hypertension, and tachycardia was consistent with stimulant-induced effects and was likely a result of methamphetamine use while in jail. He later admitted to jail psychologists that he used methamphetamine whenever it was available while incarcerated.

On November 16, 2018, Mr. Sekerke was re-evaluated by a psychiatrist and reported his sleep has been broken up due to physical pain. The psychiatrist noted that the antipsychotic previously prescribed will be adjusted to assist with his sleep.

On November 16, 2018, Mr. Sekerke submitted a grievance claiming that his ankle infection was not healing and he was not getting any treatment. He demanded treatment and a cane. The next day on November 17, 2018, after initially filing a grievance, he submitted a health request to be treated for the same issue that he submitted a grievance.

On November 20, 2018, an advanced practice provider evaluated Mr. Sekerke for that *infection not ulcer* request. On this encounter, in addition to the right ankle infection, he again complained about his neck pain, claiming that he needed a cane or a wheelchair. It was noted during the exam that Mr. Sekerke was physically agile and had no physical or functional impairments, therefore, no cane or wheelchair was ordered. He was treated with Keflex, an antibiotic, to address the small wound on his right ankle.

EXHIBIT B14

Sekerke vs Arkwright
Page **15** of **22**

Over the following several days, Mr. Sekerke began refusing to take the prescribed antibiotic due to diarrhea side effects. When an RN spoke to him about the importance of compliance on November 24, 2018, he became verbally abusive. His antibiotic was subsequently discontinued due to his refusals.

During a psychologist evaluation on November 28, 2018, Mr. Sekerke again endorsed that he had poor sleep.

On November 28 and 30, 2018, Mr. Sekerke had 2 additional episodes of hypertension and tachycardia, symptoms consistent with methamphetamine abuse in the jail, however, Mr. Sekerke attributed these symptoms to chronic pain from not receiving opioid pain medications. It is worth noting that chronic pain characteristically does not cause tachycardia. *Yes it can!*

Without the benefit of knowing that Mr. Sekerke was regularly abusing methamphetamine in jail, providers in SDJ continued to treat Mr. Sekerke with blood pressure medications and continued to follow his blood pressure. Mr. Sekerke, however, refused to take blood pressure medications, stating he did not have chronic hypertension.

On December 13, 2018, during a psychologist evaluation in regular housing, Mr. Sekerke reported: "continuing problems with sleeping due to the jail environment/noise".

On January 8, 2019, while in regular housing, Mr. Sekerke was scheduled to be evaluated for his complaint of "fever" and "rash on face". He was evaluated on January 11, 2019. There were no clinically significant skin findings on this visit.

On January 16, 2019, Mr. Sekerke was evaluated by a provider for the complaint of "brown toenails" and "neck pain". The provider noted Mr. Sekerke's continued refusal to accept prescribed blood pressure medication. Mr. Sekerke attributed his high blood pressure to his untreated chronic pain. Later, on the evening of January 16, 2019, Mr. Sekerke complained of a "headache". He attributed this to an altercation with another inmate earlier that evening. *(I)*

On January 17, 2019, Mr. Sekerke was transferred to administrative segregation (Ad Seg) housing. *(After the fight I was in I got sent to Ad-Seg.) I didn't even start the fight*

On January 18, 2019, during a psychologist evaluation, Mr. Sekerke reported poor sleep.

*(I) That altercation was with Andrew Milonis. He incorrectly thought that I was the one who was making the EXHIBIT B15 loud banging noises. He happens to be here in my prison too. Because of the banging noises, we fought.*

On January 24, 2019, during a psychiatric evaluation, Mr. Sekerke reported no issues with sleep.

On January 26, 2019, Mr. Sekerke was evaluated for the same complaint of a "rash on his face". Documentation of this rash was unremarkable for any serious medical concern.

On January 31, 2019, Dr. Freedland reviewed Mr. Sekerke's most recent episode of hypertension and tachycardia from the day before (1/30/19), in which Mr. Sekerke's again attributed his high blood pressure (as high as 207/112) and tachycardia (as high as 133 bpm) to chronic pain from not receiving opioid medications. Dr. Freedland noted Mr. Sekerke's several man-downs and chronic pain requests as the reason for submitting a pain management consult.

On February 7, 2019, Mr. Sekerke, instead of filing a health request, filed a grievance about having an abscess on his nose and requested a specific provider to evaluate him.

On February 11, 2019, Mr. Sekerke, instead of filing a health request, filed a grievance about having a rash on his face. In this grievance, he suspected Tylenol as the cause of his rash.

On March 3, 2019, Mr. Sekerke was transferred out of Ad Seg back to regular housing.

On March 21, 2019, Mr. Sekerke was re-evaluated by Dr. Leon. Mr. Sekerke complained of pain and numbness in the ulnar distribution of his forearms associated with his worsening neck pain. Given this presentation, Dr. Leon ordered an MRI of his cervical spine to evaluate for nerve compression. It is worth noting that a nerve conduction study (NCS) and an electromyogram (EMG) done later revealed no cervical nerve compression. Instead, he had mild ulnar nerve compression at the left elbow known as cubital tunnel syndrome, a benign condition dependent on elbow positioning that can cause a decreased sensation or decreased motor coordination if severe but is rarely painful. *???*

On April 25, 2019, during a brief encounter with a psychologist, he denied any recent problems with sleep.

Based on Mr. Sekerke's prior unremarkable radiographic work-up and his clinical history, Mr. Sekerke was referred to physical therapy for the treatment of his chronic neck pain in lieu of repeating another imaging study. However, he was unreceptive to physical therapy and

refused participation on multiple occasions. *Yes, I Did So and it caused me more pain*

On June 13, 2019, during a psychiatrist evaluation in regular housing, he denied issues with poor sleep. ?

On July 9, 2019, Mr. Sekerke was transferred to Ad Seg housing.

On August 5, 2019, during a psychologist's evaluation, he denied recent problems with poor sleep. ?

On August 15, 2019, during a psychologist's evaluation, he again denied recent problems with sleep. ?

On August 16, 2019, Mr. Sekerke was transferred back to regular housing.

On August 17, 2019, during a psychiatric follow-up visit in regular housing, Mr. Sekerke reported that he "can't fall asleep" and is asking for stronger sedating medications to help him sleep.

On September 26, 2019, Dr. Freedland evaluated Mr. Sekerke for the complaint of feeling dizzy, with a room-spinning sensation. Mr. Sekerke's request during this encounter was incongruent with his presenting symptoms. He again requested to be referred to pain management and requested custom orthotics for his feet. Dr. Freedland referred Mr. Sekerke to Neurology for evaluation of these symptoms.

On November 26, 2019, Mr. Sekerke was evaluated by Neurologist, Dr. Viire, for his dizziness and motion sensations. No concerning neurologic signs were elicited by Dr. Viire's physical exam. However, given Mr. Sekerke's history of hydrocephalus, Dr. Viire recommended a trial of Acetazolamide (diuretic) and referred Mr. Sekerke to the Hydrocephalus clinic in the Neurosurgery department.

On November 27, 2019, Mr. Sekerke was transferred to Ad Seg housing.

On February 28, 2020, Mr. Sekerke was evaluated by Neurosurgeon, Dr. U. During this encounter, Dr. U felt important to note separately that Mr. Sekerke requested Dr. U to order the jail medical staff to increase his pain medication regimen for his "nonoperative" cervical stenosis. Again, no concerning neurologic signs were elicited on physical exam, and multiple

EXHIBIT B17

Sekerke vs Arkwright
Page **18** of 22

scans of the head after the initial surgery were normal, most recently in 2018.  Dr. U

recommended a repeat CT of the head and referred the patient back to Neurology for a lumbar

puncture procedure (LP).  Dr. U deferred pain management decisions to his primary care

physicians.

On March 10, 2020, Mr. Sekerke was transferred back to regular housing.

On April 17, 2020, Mr. Sekerke had a repeat CT scan of the head which demonstrated no

evidence of a return of hydrocephalus and was unchanged from CT scans in 2018.

On April 20, 2020, Neurologist, Dr. Ellis, evaluated Mr. Sekerke.  During this evaluation,

Mr. Sekerke again focused on treatment for his chronic neck pain.  Dr. Ellis reviewed the record

from the neurosurgery clinic, as well as Mr. Sekerke's CT scan of his head and cervical spine,

and noted that Mr. Sekerke's CT of the cervical spine in 2018 was normal.  LP was performed

successfully, but given Mr. Sekerke's focus on symptoms surrounding his chronic neck pain, Dr.

Ellis ordered an EMG and NCS as well as an MRI of the neck.  He also referred Mr. Sekerke to

physical therapy and a pain management specialist for a nerve block.

On May 5, 2020, Mr. Sekerke had a repeat MRI of the cervical spine which showed no

acute injuries and no spinal cord compression.  *See my (exhibit B) The M.R.I.*

On June 12, 2020, Pain Management Specialist, Dr. Castellanos, evaluated Mr. Sekerke.

The recommendation by Dr. Castellanos was to perform a cervical epidural steroid injection in 2-

6 weeks.

On July 27, 2020, Mr. Sekerke returned to the Neurology clinic for the recommended

EMG and NCS to localize the origin of Mr. Sekerke's nerve impingement symptoms.  These tests

conclusively showed that Mr. Sekerke did not have nerve impingement or radiculopathy from his

cervical spine.  He did, however, have mild cubital tunnel syndrome, a benign condition that

predominantly causes decreased sensation in the hand, but not pain.  *??? (need to see those records)*

On July 29, 2020, Mr. Sekerke returned to the pain management clinic and received the

recommended epidural steroid injection.

On November 25, 2020, Mr. Sekerke was transferred to Ad Seg.  On July 16, 2021, Mr.

EXHIBIT B18

Sekerke was transferred to the California Department of Corrections and Rehabilitation (CDCR) to serve his 5th sentence in CDCR.

## VI.   **OPINION**

Based on my review of the materials provided, my education, training in primary care and addiction medicine, and 21 years of clinical experience, of which over 16 years were spent in the correctional health care setting, it is my opinion that there was no evidence that Mr. Sekerke suffered any medical conditions as a direct result of his housing assignment in administrative segregation (Ad Seg).

### Discussion

Mr. Sekerke claimed through his complaint and his responses to interrogatories, that he "hurt [his] neck" and "suffered severe headaches" as a result of a suicide attempt in Ad Seg. He also claimed that he developed "rashes", lethargy from deprivation of sleep, and high blood pressure as a result of Ad Seg housing. I found no evidence to support any of these claims. On the contrary, the records show that Mr. Sekerke had a long history of alleging medical ailments to manipulate staff, obtain accommodations and obtain highly abused medications.

### *Neck pain and Headache*

Mr. Sekerke's neck pain and headache is not a new problem that developed during Ad Seg housing placement. On the contrary, Mr. Sekerke had a long-standing history of substance abuse. His drugs of choice were opioids and methamphetamine. From at least 2008, Mr. Sekerke *Lies!* began abusing opioids. For many years before the relevant time of Ad Seg housing placements, Mr. Sekerke claimed severe, debilitating neck pains and headaches and demanded treatments with opioid medications. However, over those years before the relevant time frame, Mr. Sekerke had multiple CTs and MRIs, including a CT and MRI taken after his alleged injury in Ad Seg, showing that Mr. Sekerke had no injuries or spinal cord compression. He also had multiple

EXHIBIT B19

Sekerke vs Arkwright
Page 20 of 22

specialists documenting and informing him that there were no objective findings of any neck or

head injury necessitating chronic use of opioid medications.  Despite his knowledge of these

*(ie)*  facts, Mr. Sekerke continued to allege severe neck pains and headaches for secondary gains.

Objective finding from various imaging studies and independent medical evaluations from third-

party specialists contradict Mr. Sekerke's claim of suffering these injuries during the relevant

time. *I never said I suffered my neck injuries "during the relevant time"*
*He is confusing when I said I hurt my neck from trying to*
*Rash  harm myself with my already conditions I have .*

Mr. Sekerke claimed that he developed a rash as a result of the conditions of Ad Seg

housing.  This claim was non-specific and did not reference any dermatologic diagnosis.  When

asked about this allegation during deposition testimony, he testified that he touched his face with

his feces-contaminated hands and caused a rash on his face during his placement in Ad Seg.

Contrary to his claim, Mr. Sekerke's medical record shows that he complained about a rash on

his face while housed in CDCR on June 29, 2017, and again while in regular housing at SDJ on

January 8, 2019, approximately 10 days prior to being transferred into Ad Seg housing on

January 17, 2019.  Additionally, Mr. Sekerke submitted a grievance on February 11, 2019, while

housed in Ad Seg, claiming that he had a rash on his face that he alleged was caused by taking

Acetaminophen (Tylenol).  This grievance in his own words contradicts his later claim to the

court that it was caused by his feces-contaminated hands.  Mr. Sekerke's extensive health care

records also show that he had complained of and been treated for a variety of skin rashes

elsewhere on his body before and after his Ad Seg housing placement.  These records contradict

Mr. Sekerke's claim of developing a rash as a result of Ad Seg placement.  *I had multiple*
*rashes from several different causes. One of them was in fact*
*Lethargy from sleep deprivation     From the feces.*

Mr. Sekerke's claim of lethargy from deprived sleep as a result of Ad Seg housing

condition  was  also  not  supported  by  the  extensive  health  care  records.   Throughout  his

EXHIBIT B20

incarceration at SDJ, Mr. Sekerke made inconsistent claims about his sleep. Most of his claims

of poor sleep occurred while in regular housing. While during his Ad Seg housing, with few

*And the noise is heard in both Ad-segs an regular housing.*

exceptions, he consistently reported no problems with his sleep. In my experience, sleep issues

arising out of light and noise issues in the jail setting are common, however, these complaints do

not constitute a serious medical concern. Furthermore, according to Mr. Sekerke's health

records, he did not express any serious medical manifestations from poor sleep during his time

housed in Ad Seg. Mr. Sekerke's self-reports at the time of his incarceration in SDJ as reflected

in the health care records contradict his claim.

### High Blood Pressure

Mr. Sekerke claimed that he developed high blood pressure as a result of his placement in

Ad Seg. This claim is simply false. During his incarceration at SDJ, Mr. Sekerke's blood

pressure was volatile throughout his incarceration. Attachment A of this report illustrates Mr.

Sekerke's blood pressure during relevant times of his SDJ incarceration. The readings in this

table that reflect his blood pressure while housed in Ad Seg are denoted with an asterisk in the

right column. As illustrated in this table, Mr. Sekerke's blood pressure elevations have no

temporal relationship to his housing in Ad Seg. Furthermore, during his incarceration at SDJ,

instead of attributing his high blood pressure to conditions in Ad Seg, Mr. Sekerke claimed that

his blood pressure elevations were caused by not receiving opioid medications for his chronic

pain. This pattern of volatile blood pressure illustrated in Mr. Sekerke's medical records is

consistent with the pattern of regular methamphetamine abuse. The high volume of street

bookings in the jail setting means there is a regular supply of street drugs coming into the jail,

making them available to patients such as Mr. Sekerke who admitted to abusing

methamphetamine whenever it was available in the jail. The blood pressure pattern documented

in his medical records and Mr. Sekerke's self-reports at the time of his incarceration at SDJ

Sekerke vs Arkwright
Page 22 of 22

contradict his claim.

My opinions, in this case, are based on many years of education and experience in correctional health care and the documents provided to me for review. I hold my opinions to a reasonable degree of medical certainty. I reserve the right to supplement this opinion in the event additional documentation is provided in this matter.

Dated January 6, 2023, in Anaheim, California

Chun Hsien Chiang, MD

EXHIBIT B22

Attachment A

| Date | Blood Pressure | Pulse | | Date | Blood Pressure | Pulse | |
|---|---|---|---|---|---|---|---|
| 10/12/2018 2:35 | 127/88 | 100 | | 12/25/2020 23:05 | 131/66 | 128 | * |
| 10/12/2018 11:08 | 120/80 | | | 12/28/2020 3:53 | 165/99 | 99 | * |
| 10/17/2018 14:56 | 163/94 | 100 | | 1/1/2021 18:42 | 177/100 | 114 | * |
| 10/25/2018 8:46 | 130/72 | 77 | | 1/8/2021 17:00 | 142/89 | 93 | * |
| 10/29/2018 17:31 | 127/72 | 86 | | 1/14/2021 20:36 | 146/89 | | * |
| 11/6/2018 14:30 | 170/102 | | | 1/19/2021 17:38 | 189/100 | 105 | * |
| 11/14/2018 14:29 | 181/111 | | | 1/25/2021 2:22 | 152/83 | 82 | * |
| 11/14/2018 17:45 | 147/100 | | | 2/12/2021 23:57 | 150/90 | 88 | * |
| 11/14/2018 23:05 | 181/87 | 136 | | 2/25/2021 14:12 | 156/92 | 90 | * |
| 11/21/2018 18:41 | 181/87 | | | 6/4/2021 0:21 | 178/93 | 113 | * |
| 11/28/2018 15:00 | 171/105 | 101 | | | | | |
| 11/30/2018 20:26 | 178/79 | | | | | | |
| 11/30/2018 21:34 | 122/80 | | | | | | |
| 12/15/2018 19:54 | 122/80 | | | | | | |
| 12/9/2018 21:27 | 141/86 | 86 | | | | | |
| 12/9/2018 12:40 | 145/87 | 116 | | | | | |
| 12/19/2018 0:00 | 141/79 | | | | | | |
| 12/22/2018 13:00 | 154/102 | | | | | | |
| 12/29/2018 15:09 | 173/116 | | | | | | |
| 1/12/2019 13:54 | 161/111 | | | | | | |
| 1/16/2019 20:49 | 154/100 | 112 | | | | | |
| 1/23/2019 0:00 | 175/112 | 99 | * | | | | |
| 1/30/2019 14:15 | 207/112 | 110 | * | | | | |
| 1/30/2019 16:42 | 141/86 | 109 | * | | | | |
| 2/7/2019 14:39 | 128/110 | 90 | * | | | | |
| 2/17/2019 14:26 | 172/124 | 108 | * | | | | |
| 3/21/2019 8:25 | 187/115 | 94 | | | | | |
| 3/25/2019 17:13 | 146/83 | 115 | | | | | |
| 3/25/2019 23:19 | 123/69 | 76 | | | | | |
| 4/12/2019 10:14 | 168/92 | 108 | | | | | |
| 5/13/2019 8:37 | 148/88 | 80 | | | | | |
| 5/16/2019 16:45 | 153/93 | 135 | | | | | |
| 5/17/2019 6:43 | 148/64 | 78 | | | | | |
| 8/22/2019 14:25 | 157/86 | 99 | | | | | |
| 9/9/2019 21:19 | 130/74 | 89 | | | | | |
| 7/3/2020 13:40 | 146/110 | | | | | | |
| 7/4/2020 13:17 | 144/99 | 89 | | | | | |
| 7/4/2020 13:35 | 144/99 | 89 | | | | | |
| 7/5/2020 13:25 | 148/92 | 102 | | | | | |
| 7/5/2020 13:41 | 148/92 | 102 | | | | | |
| 7/7/2020 9:14 | 151/101 | 90 | | | | | |
| 7/9/2020 0:20 | 168/96 | 95 | * | | | | |
| 7/14/2020 14:14 | 152/102 | 82 | * | | | | |
| 9/9/2019 21:19 | 130/74 | 89 | | | | | |
| 10/6/2020 15:33 | 152/92 | 85 | | | | | |
| 11/6/2020 21:01 | 149/86 | 101 | | | | | |

EXHIBIT B23

**C. Hsien Chiang, MD, FACCP, CCHP-P**
P.O. Box 27935
Anaheim, CA 92809
Phone:  949-502-1858
hsien@correctionalhealthcareconsultant.com

## PROFESSIONAL POSITIONS

Orange County Health Care Agency                                2011-present
Correctional Health Services - Medical Director
Responsible for clinical oversight of patient care in Orange County's adult jail and juvenile
detention facilities.  Responsibilities include: Direct supervision of physicians and mid-level
providers in both medical and mental health specialties; Monitoring subspecialty and
hospital utilization through managed care concept to ensure medically necessary services
are delivered in a timely fashion; Close collaboration with Sheriff's department
management and county counsel in identifying and developing or advising on development
of custody policies that meet or exceed regulatory standards and comply with mandated
guidelines.

Orange County Health Care Agency                                2006-2011
Correctional Medical Service – Staff Physician
Responsible for direct patient care of in-custody patient-inmates in Orange County's five Jail
facilities, as well as, providing clinical support and supervision to mid-level providers in
these facilities.

Hoag Family Care Centers Urgent Care Facilities:        Part-time    2002-2006
Attending physician
Responsible for direct patient care of various acute
illnesses and acute exacerbation of chronic conditions, as well
as, performing various dermatological procedures, minor surgical
procedures and outpatient orthopedic procedures.

Stonecreek Family Medical Center, Inc.                        2002-2006
Private practice in primary care and preventive medicine
Irvine, California.

## EDUCATION

Long Beach Memorial Family Medicine Residency        1999-2002
Long Beach, California
Medical Internship and Residency in Family Medicine

Medical College of Wisconsin                                1995-1999
Milwaukee, Wisconsin
Doctorate of Medicine

EXHIBIT B24

University of California, Irvine                                  1990-1994
Irvine, California
Bachelor of Science

**ACADEMIC/TEACHING EXPERIENCE**
Long Beach Memorial Family Medicine
    Clinical preceptor                                        2014-Present
Department of Family Medicine, University of California, Irvine,
    School of Medicine. Associate Clinical Professor         2019-Present
Department of Addiction Medicine, Loma Linda University
    Addiction Medicine Fellowship preceptor                  2022-Present

**PROFESSIONAL AFFILIATIONS**

National Commission on Correctional Health Care (NCCHC) Member
Fellow of American College of Correctional Physicians (FACCP)
Western American Correctional Health Services Association (WACHSA) – CA/NV
Chapter
American Medical Association (AMA) Member
American Society of Addiction Medicine (ASAM) Member
California Society of Addiction Medicine (CSAM) Member

**BOARD CERTIFICATIONS/LICENSURE**
American Board of Family Medicine                                Current
Subspecialty Board Certification in Addiction Medicine           Current
Certificate of Added Qualification for Buprenorphine             Current
Certified Correctional Health Professional (CCHP)                Current
CCHP – Specialty Certification for Physicians (CCHP-P)           Current
California Medical License                                       Current
DEA                                                              Current
BLS                                                              Current

EXHIBIT B25

**C. Hsien Chiang, MD, FACCP, CCHP-P**
P.O. Box 27935
Anaheim, CA 92809
Phone:  949-910-6889
hsien@correctionalhealthcareconsultant.com

## PROFESSIONAL POSITIONS

Orange County Health Care Agency                                2011-present
Correctional Health Services - Medical Director
Responsible for clinical oversight of patient care in Orange County's adult jail and juvenile
detention facilities.  Responsibilities include: Direct supervision of physicians and mid-level
providers in both medical and mental health specialties; Monitoring subspecialty and
hospital utilization through managed care concept to ensure medically necessary services
are delivered in a timely fashion; Close collaboration with Sheriff's department
management and county counsel in identifying and developing or advising on development
of custody policies that meet or exceed regulatory standards and comply with mandated
guidelines.

Orange County Health Care Agency                                2006-2011
Correctional Medical Service – Staff Physician
Responsible for direct patient care of in-custody patient-inmates in Orange County's five Jail
facilities, as well as, providing clinical support and supervision to mid-level providers in
these facilities.

Hoag Family Care Centers Urgent Care Facilities:        Part-time   2002-2006
Attending physician
Responsible for direct patient care of various acute
illnesses and acute exacerbation of chronic conditions, as well
as, performing various dermatological procedures, minor surgical
procedures and outpatient orthopedic procedures.

Stonecreek Family Medical Center, Inc.                          2002-2006
Private practice in primary care and preventive medicine
Irvine, California.

## EDUCATION

Long Beach Memorial Family Medicine Residency              1999-2002
Long Beach, California
Medical Internship and Residency in Family Medicine

Medical College of Wisconsin                                    1995-1999
Milwaukee, Wisconsin
Doctorate of Medicine

EXHIBIT B26

University of California, Irvine                          1990-1994
Irvine, California
Bachelor of Science

## ACADEMIC/TEACHING EXPERIENCE

Long Beach Memorial Family Medicine
    Clinical preceptor                                    2014-Present
Department of Family Medicine, University of California, Irvine,
    School of Medicine. Associate Clinical Professor      2019-Present

## PROFESSIONAL AFFILIATIONS

National Commission on Correctional Health Care (NCCHC) Member
Fellow of American College of Correctional Physicians (FACCP)
Western American Correctional Health Services Association (WACHSA) – CA/NV
Chapter Board Member
American Medical Association (AMA) Member
American Society of Addiction Medicine (ASAM) Member
California Society of Addiction Medicine (CSAM) Member

## BOARD CERTIFICATIONS/LICENSURE

American Board of Family Medicine                        Current
Subspecialty Board Certification in Addiction Medicine   Current
Certificate of Added Qualification for Buprenorphine     Current
Certified Correctional Health Professional (CCHP)        Current
CCHP – Specialty Certification for Physicians (CCHP-P)   Current
California Medical License                               Current
DEA                                                      Current
BLS                                                      Current

EXHIBIT B27

## DECLARATION OF SERVICE

I, the undersigned, declare under penalty of perjury that I am over the age of eighteen years and not a party to the case; I am employed in the County of San Diego, California. My business address is 1600 Pacific Highway, Room 355, San Diego, California, 92101.

On January 6, 2023, I served the following documents:

**DEFENDANT LT. ADAM ARKWRIGHT'S EXPERT DISCLOSURES**

in the following manner:

☒   **(BY MAIL)** By causing a true copy thereof, enclosed in a sealed envelope, with postage fully prepaid, for each addressee named below and depositing each in the U. S. Mail at San Diego, California.

Keith Wayne Sekerke BP1899
Valley State Prison
P. O. Box 92
Chowchilla, CA 93610-0092

I declare under penalty of perjury that the foregoing is true and correct. Executed on January 6, 2023, at San Diego, California.

V. Greska

# EXHIBIT  B

Description of this Exhibit   My MRI from may 2020
taken while I was an
inmate at the San Diego
County Jail

Number of Pages   _____

Sekerke, Keith Wayne (MRN 20213286)

# Sekerke, Keith Wayne

MRN: 20213286

**MRI CERVICAL SPINE W/O CONTRAST** 5/5/2020
HCH MRI

## ⚕ Results

| Procedure | Component | Value | Ref Range | Date/Time |
|---|---|---|---|---|
| **MRI Cervical Spine W/O Contrast [238253487]** | | | | Collected: 05/05/20 1228 |
| Order Status: **Completed** | | | | Updated: **05/05/20 1253** |

Narrative:
EXAM DESCRIPTION:
MRI CERVICAL SPINE W/O CONTRAST:5/5/2020 9:20 am

CLINICAL HISTORY:
Cervical radiculopathy.

TECHNIQUE:
Multiplanar multisequence MR imaging of the cervical spine was performed without intravenous contrast.

COMPARISON:
CT cervical spine dated 12/9/2018.

FINDINGS:
There is no acute fracture. Vertebral body heights are preserved. Vertebral alignment and bone marrow signal are normal. The spinal cord has a normal appearance. The foramen magnum and inferior posterior fossa structures are normal.

There is moderate degenerative disc disease and mild facet arthropathy of the cervical spine.

C2-C3: No significant spinal canal or neural foraminal narrowing.

C3-C4: There is a right paracentral and foraminal disc osteophyte complex that causes moderate narrowing of the spinal canal on the right with contact and indentation of the ventral cord. No focal cord signal abnormalities. Disc osteophyte complex causes moderate right neural foraminal narrowing. Mild left neural foraminal narrowing.

C4-C5: No significant spinal canal narrowing. Facet hypertrophy contributes to mild left neural foraminal narrowing. No right neural foraminal narrowing.

C5-C6: Right paracentral and foraminal disc osteophyte complex with associated annular fissuring causes moderate narrowing of the spinal canal on the right with contact and indentation of the ventral cord. No focal cord signal abnormalities. Uncovertebral and facet osteophytes contribute to mild bilateral neural foraminal narrowing.

C6-C7: Broad-based disc osteophyte complex causes moderate narrowing of the spinal canal without contact of the ventral cord. No focal cord signal abnormalities. Uncovertebral and facet osteophytes contribute to severe right and moderate left neural foraminal narrowing.

C7-T1: No significant spinal canal or neural foraminal narrowing.

Postsurgical changes are seen within the suboccipital soft tissues, left greater than right.

CONCURRENT SUPERVISION:
I have reviewed the images and agree with the fellow's interpretation.
SEKERKE, KEITH WAYNE  700015199 (18165284)

| Procedure | Component | Value | Ref Range | Date/Time |
| --- | --- | --- | --- | --- |

Preliminary created by: Maxwell, Christopher
Signed by: Dorros, Stephen 05/05/2020 12:50:51
Impression:
IMPRESSION:
Moderate degenerative changes of the cervical spine.

C3-C4:  moderate narrowing of the spinal canal and moderate right neural foraminal narrowing.

C5-C6: moderate narrowing of the spinal canal on the right with contact and indentation of the ventral cord.

C6-C7: moderate narrowing of the spinal canal without contact of the ventral cord and severe right and moderate left neural foraminal narrowing.

Sekerke, Keith Wayne (MRN 20213286) Printed by Arce, Yvonne [YRAB] at 5/7/20 9:30 AM

SEKERKE, KEITH WAYNE  700015199 (18165284)

CSD003001

# EXHIBIT  C

Description of this Exhibit  *Neurosurgery report - I was Sent to UCSD November 2020 Ordered by The jail doctors. It has my jail booking number Written in at the top*

Number of Pages  _____

18165284

# AFTER VISIT SUMMARY

**UC San Diego Health**

**Keith W. Sekerke** MRN: 20213286 DoB: 6/19/1976

📅 11/20/2019  4:00 PM  📍 UCSD HILLCREST MON NEUROLOGY 619-543-3500

## Instructions from Erik Scott Viirre, MD

 **Neurosurgery**
You have been referred to the Department of Neurosurgery for a clinic consult. Please call to schedule an appointment at your earliest convenience. Insurance varies from person to person and you may also need an insurance authorization prior to being seen.

Neurosurgery Department scheduling phone number: 619-543-5540.
For Rancho Bernardo - Via Tazon location: 800-926-8273

We look forward to serving your Neurosurgery needs.

## Today's Visit

You saw Erik Scott Viirre, MD on Wednesday November 20, 2019 for: Neurologic Problem. The following issue was addressed: Hydrocephalus, unspecified type.

## What's Next

You currently have no upcoming appointments scheduled.

## Patient Demographics

| Address | Phone | E-mail Address |
|---|---|---|
| 1173 Front St<br>SAN DIEGO CA 92101 | 619-610-1647 (Home) *Preferred* | keithwaynesekerke1904@gmail.com |

## MyChart

Sign up for access to our MyUCSDChart patient web portal. With an account, you can access your health information online, view most lab test results, securely exchange messages with your clinic, request appointments, access our free mobile app, and more.

To sign up for MyUCSDChart, please call Customer Support at 619-543-5220 (M-F 9a-4p) or visit our web page at myucsdchart.ucsd.edu and click Request to Sign Up. Or, click Create Account if activation code provided below.

63FKF-8K3VH
Expires: 2/18/2020  4:16 PM
SEKERKE, KEITH WAYNE  700015199 (18165284)

# Your Medication List as of November 20, 2019 4:16 PM

ⓘ Always use your most recent med list.

| | Morning | Afternoon | Evening | Bedtime |
|---|---|---|---|---|
| **ALBUTEROL IN** Inhale 2 pfu by mouth every 4 hours as needed. | | | | |
| **amoxicillin** 500 MG capsule Commonly known as: AMOXIL Take 500 mg by mouth 2 times daily. | | | | |
| **beclomethasone** 40 MCG/ACT inhaler Commonly known as: QVAR Inhale 2 puffs by mouth 2 times daily. | | | | |
| **buPROPion** 150 MG SR tablet Commonly known as: WELLBUTRIN SR Take 150 mg by mouth 2 times daily. | | | | |
| **busPIRone** 15 MG tablet Commonly known as: BUSPAR Take 15 mg by mouth 2 times daily. | | | | |
| **citalopram** 20 MG tablet Commonly known as: CELEXA Take 20 mg by mouth daily. | | | | |
| **diphenhydrAMINE** 50 MG capsule Commonly known as: BENADRYL Take 50 mg by mouth 3 times daily as needed for Itching. | | | | |
| **gabapentin** 400 MG capsule Commonly known as: NEURONTIN Take 400 mg by mouth 2 times daily. | | | | |
| **HYDROcodone-acetaminophen** 5-500 MG tablet Commonly known as: VICODIN Take 1 tablet by mouth every 6 hours as needed for Moderate Pain (Pain Score 4-6). | | | | |
| **ibuprofen** 600 MG tablet Commonly known as: MOTRIN Take 600 mg by mouth every 6 hours as needed for Mild Pain (Pain Score 1-3). | | | | |
| **omeprazole** 20 MG capsule Commonly known as: PRILOSEC Take 20 mg by mouth daily. | | | | |

# Medication Refills

Please contact your pharmacy to see if you have refills remaining on your prescription.  If no refills are available, allow 3 business days for the pharmacy to request additional refills.

# You are allergic to the following

SEKERKE, KEITH WAYNE  700015199 (18165284)

You are allergic to the following (continued)

| Allergen | Reactions |
|---|---|
| **Dilantin (Phenytoin)** | Rash |
| **Doxycycline** | Rash |
| **Lamictal (Aspartame-Lamotrigine)** | Swelling |
| **Toradol** | Rash |
| | Other |
| Also migraines | |
| **Risperdal (Risperidone)** | Other |
| Leg spasm | |

## Insurance Coverage Disclaimer

Please note that any screening tests ordered are recommended, but you must check into your insurance coverage prior to undergoing these tests as your insurance may not cover them in your plan.

If your health care is delivered through a health maintenance organization (HMO), then please get confirmation from our staff of insurance approval before undergoing any tests or receiving care.

## 🔒 Health Maintenance Summary ⮐                                    Full History

| | |
|---|---|
| **PHQ9 Depression Monitoring doc flowsheet (Every 4 Months)** | **Overdue since 6/19/1994** |
| **DTaP,Tdap,and Td Vaccines (1 - Tdap)** | **Overdue since 6/19/1995** |
| **INFLUENZA VACCINE (Every 8 Months - August to April)** | **Overdue since 8/1/2019** |
| Zoster Vaccine (1 of 2) | Next due on 6/19/2026 |
| Polio Vaccine | Aged Out |
| HPV Vaccine <= 26 Yrs | Aged Out |
| Meningococcal MCV4 Vaccine | Aged Out |

## Additional Information

For more information about any of your health conditions, logon to your MyChart and search our Health Library section or visit our website at http://health.ucsd.edu/healthinfo

If you or a loved one would like information on how to quit smoking or about suicide prevention, call:
- California Smokers' and Chewers' Helpline: 1-800-NO-BUTTS
- National Suicide Prevention Lifeline: 1-800-273-TALK (8255)
- San Diego Access and Crisis Line: 1-888-724-7240

## Billing and Insurance Information

We're here to help.  For billing questions. Call **855-827-3633**, 9a.m. to 6 p.m. Weekdays, or email askus@ucsd.edu

## Requests for Continuing Care Document

You can download an electronic copy of your Continuing Care Document, a summary of your health information at UC San Diego Health.  Log on to MyUCSDChart (https://myucsdchart.ucsd.edu) and go to "My Medical Record" > "Download Summary."

CSD002320

# Your Medication List as of November 20, 2019  4:16 PM

ⓘ **Always use your most recent med list.**

| | Morning | Afternoon | Evening | Bedtime |
|---|---|---|---|---|

**ALBUTEROL-IN**
Inhale 2 pfu by mouth every 4 hours as needed.

**amoxicillin 500 MG capsule**
Commonly known as: AMOXIL
Take 500 mg by mouth 2 times daily.

**beclomethasone 40 MCG/ACT inhaler**
Commonly known as: QVAR
Inhale 2 puffs by mouth 2 times daily.

**buPROPion 150 MG SR tablet**
Commonly known as: WELLBUTRIN SR
Take 150 mg by mouth 2 times daily.

**busPIRone 15 MG tablet**
Commonly known as: BUSPAR
Take 15 mg by mouth 2 times daily.

**citalopram 20 MG tablet**
Commonly known as: CELEXA
Take 20 mg by mouth daily.

**diphenhydrAMINE 50 MG capsule**
Commonly known as: BENADRYL
Take 50 mg by mouth 3 times daily as needed for itching.

**gabapentin 400 MG capsule**
Commonly known as: NEURONTIN
Take 400 mg by mouth 2 times daily.

**HYDROcodone-acetaminophen 5-500 MG tablet**
Commonly known as: VICODIN
Take 1 tablet by mouth every 6 hours as needed for
Moderate Pain (Pain Score 4-6).

**ibuprofen 600 MG tablet**
Commonly known as: MOTRIN
Take 600 mg by mouth every 6 hours as needed for Mild
Pain (Pain Score 1-3).

**omeprazole 20 MG capsule**
Commonly known as: PRILOSEC
Take 20 mg by mouth daily.

# Medication Refills

Please contact your pharmacy to see if you have refills remaining on your prescription.  If no refills are available, allow 3 business days for the pharmacy to request additional refills.

# You are allergic to the following

Keith W. Sekerke (MRN: 20213286) • Printed by [VAT5] at 11/20/19  4:16 PM

SEKERKE, KEITH WAYNE  700015199 (18165284)

Page 2 of 6   Epic

## Additional Information

For more information about any of your health conditions, logon to your MyChart and search our Health Library section or visit our website at http://health.ucsd.edu/healthinfo

If you or a loved one would like information on how to quit smoking or about suicide prevention, call:
- California Smokers' and Chewers' Helpline: 1-800-NO-BUTTS
- National Suicide Prevention Lifeline: 1-800-273-TALK (8255)
- San Diego Access and Crisis Line: 1-888-724-7240

## Billing and Insurance Information

We're here to help.  For billing questions. Call **855-827-3633**, 9a.m. to 6 p.m. Weekdays, or email askus@ucsd.edu

## Requests for Continuing Care Document

You can download an electronic copy of your Continuing Care Document, a summary of your health information at UC San Diego Health.  Log on to MyUCSDChart (https://myucsdchart.ucsd.edu) and go to "My Medical Record" > "Download Summary."

If you do not have MyUCSDChart and are interested signing up, please call MyUCSDChart Customer Service at (619) 543-5220 (Monday through Friday, 9AM to 4PM).

## Safe use of Opioids

CSD003064

Safe use of Opioids (continued)
## Safe use of Opioids

**What is an opioid?**
- A strong prescription pain medication that is often prescribed after surgery, severe injury, or for cancer related pain.
- Examples include:
  - Hydrocodone (Vicodin), Hydromorphone (Dilaudid), Oxycodone, Oxymorphone (Opana), Morphine, Methadone, Fentanyl.

**How to use opioids safely and manage pain after surgery or injury**
- Use opioids if you have severe pain that is not controlled with over-the-counter medications or non-opioid medications.
- Use opioids only as prescribed for the shortest duration possible
  - Taking more than your doctor told you could lead to injury or death.
- Do not combine opioids with alcohol, benzodiazepines (diazepam, alprazolam), muscle relaxants or sleep aids.
  - These combinations can increase the risk of overdose and death.
- Do not use opioids before driving or operating heavy machinery.
- Possible side effects of opioids: nausea/vomiting, sleepiness/dizziness, confusion, constipation, dry mouth, itching, tolerance (needing to take more of the medication for the same pain relief), addiction/dependence.
- It is illegal to share your opioids with others.

**Accidental overdose**
- Signs of overdose include drowsiness, slurred speech, slow shallow breathing, choking/gurgling, or pale blue skin.
- Tell your family members if you are taking opioids, so they know to call 9-1-1 if you stop breathing or stop responding.

**Storage and Disposal**
- Store opioids in a safe place out of reach of others (infants, children, family, and friends).
- Dispose of any leftover opioid medications. Leftover opioids from a friend/family member are the number one way that teenagers gain access to opioids.
- Opioids can be disposed of at medication take back drives, select pharmacies or police station drop boxes. For a location near you, visit the following websites:
  - DEA Search Site for Prescription Drug Drop off: https://apps.deadiversion.usdoj.gov/pubdispsearch
  - San Diego County Drug Abuse Task Force Prescription Drug Collection:
    https://docs.wixstatic.com/ugd/aa9d62_92295cc26c224ff7aae9S7a15c0f2689.pdf
  - Orange County Collaborative on Prescription Drug Abuse: http://www.saferxoc.org/
  - Riverside County Proper Disposal of Medications: https://www.rcwaste.org/Waste-Guide/ medication
  - UC San Diego Health MedSafe disposal box located at: Center for Pain Medicine waiting room, 9400 Campus Point Drive, Komen Outpatient Pavilion
- If no take-back location is available, the FDA recommends flushing leftover opioids.

CSD003065

Safe use of Opioids (continued)

## Your feedback is important to us

We strive to provide every patient with an exceptional patient care experience. You may receive a patient satisfaction survey in the next few weeks. Please fill out the survey upon receipt and return it in the self-addressed envelope. We value your feedback and use it to help improve the experience for all our patients at UC San Diego Health. Please call *We Listen* at 619-543-5678 if you want to share a positive experience you had at our facility or if you have suggestions about how we can improve our services. **For medical questions or emergencies, please call your physician's office or 911.** Thank you!

CSD003066

Sekerke, Keith Wayne (MRN: 20213286) DOB: 06/19/1976

# Physical Therapy - Outside (Non-UCSD) [CON9046] (Order 238253489)

Referral

Date and Time: 5/26/2020 9:44 AM  Department: UCSD Neurological Institute - Neurosurgery / Perlman
Ordering/Authorizing: Wheeler, Samantha K, PA

## Patient Information

| Patient Name | Sex | DOB AGE |
|---|---|---|
| Sekerke, Keith Wayne (20213286) | Male | 6/19/1976 (43 year old) |

## Order Information

| Order Date/Time | Release Date/Time | Start Date/Time | End Date/Time |
|---|---|---|---|
| 05/26/20 09:44 AM | None | 5/26/2020 | None |

## Order Details

| Frequency | Duration | Priority | Order Class |
|---|---|---|---|
| None | None | Routine | External referral |

## Priority and Order Details

| Priority | Order Status | Class |
|---|---|---|
| Routine | Sent | External referral |

## Specimen Information

## Order Questions

| Question | Answer | Comment |
|---|---|---|
| Clinical history | hx of cervical neck pain and radiculopathy | |
| Special Precautions: | None | |
| PT Service Request: | Evaluate and Treat | |
| Frequency (in weeks) | 1-2 times | |
| Duration (in weeks) | 6-8 | |

## Associated Diagnoses

| | | ICD-10-CM | ICD-9-CM |
|---|---|---|---|
| Cervical radiculopathy | Primary | M54.12 | 723.4 |
| DDD (degenerative disc disease), cervical | | M50.30 | 722.4 |

## Scheduling Instructions

Your physician has referred you to the Physical Therapy department. Please call the number or one of the numbers at the locations listed below to schedule your appointment. If you have an HMO insurance, you will need authorization prior to scheduling your PT visit to ensure you are referred to an in-network provider.

Physical Therapy phone numbers:
Any physical therapy location based on patient's insurance coverage

## Process Instructions

SEKERKE, KEITH WAYNE  700015199 (18165284)

# EXHIBIT  D

Description of this Exhibit *Another report From April 2020 are seeing The record os, it while I wes in The Jail*

Number of Pages _____

Sekerke, Keith Wayne (MRN 20213286) DOB: 06/19/1976

Encounter Date: 04/20/2020

# Sekerke, Keith Wayne

MRN: 20213286

**Office Visit** 4/20/2020
UCSD HILLCREST MON
NEUROLOGY

Provider: Ellis, Ronald Joseph, MD (Neurology)
Primary diagnosis: Hydrocephalus, unspecified type (CMS-HCC)
Reason for Visit: Neurologic Problem; Referred by Diego, Central Jail-San

## Progress Notes

Cosino, Anjelica Therese P, NP (Nurse Practitioner) • Neurology

Cosigned by: Ellis, Ronald Joseph, MD at 4/20/2020  5:32 PM

Attestation signed by Ellis, Ronald Joseph, MD at 4/20/2020 5:32 PM

Neurology Attending Physician
I performed or was physically present during the history and examination, review of relevant ancillary tests and formulation of the diagnostic and management plan. I reviewed and confirmed details of the interval history, past medical, social and family histories, medications, review of systems, physical and neurological examinations and ancillary studies with Anjelica Pascual Cosino, NP. Details as described in her note represent an accurate transcription of my evaluation and management.

- On my exam there is reduced range of motion in neck flexion, extension, and left lateral flexion. There is altered pin sensation in the distribution of the left greater occipital nerve. Altered pin and light touch sensation in a left C6/7 distribution.

Impressions and plan:
- Cervicogenic pian with possible greater occipital neuralgia.
  Head CT not consistent with recurrent hydrocephalus.
  Left C6/7 radiculopathies.
  physical therapy, EMG, MRI cervical spine, greater occipital nerve injection.
  I spent at least 50% of a 60 minute visit interviewing, examining and counseling the patient.

**UC San Diego Health**
**Neurology Consult Note**

**Chief Complaint:** Hydrocephalus
Diego, Central Jail-San has consulted me for recommendations on the evaluation and management of the chief complaint above.

**History of Present Illness:**
This is a 43 year old male with multiple comorbid conditions as outlined in the problem list and medical history. I have not seen this patient before in clinic. He has been seen by my colleagues MD Viirre for dizziness and MD Hirshman for Hx posterior fossa cyst/Hx VP shunt (2008, surgeries were done here at UCSD by Dr. U), now removed. He is accompanied by two correctional officers at today's visit.

Pt was originally seen by Dr. Viirre d/t sensation of constantly "being on a boat". Reports near falls; has been able to catch himself. Sensation started about 1yr ago and has become progressively worse. Not continuous but sensation occurs every day. Sensation is worse when he lays down and improves when standing up. Denies spinning sensation, visual changes, leg weakness, nausea. Reports symptoms are similar to when he first had hydrocephalus except he now does not experience any HAs or syncopal episodes. Denies memory changes. Reports daily, scant bowel incontinence which the pt reports that he has to wipe himself more frequently. No sudden or large amount of stool incontinence. Denies urinary incontinence. Additionally reports chronic neck pain; denies recent trauma.

Note by MD Hirshman 2/28/2020:
Keith Wayne Sekerke is a 43 year old male with a past history significant for posterior fossa cyst status post fenestration (2008), placement of a VP shunt (2008), and subsequent removal one month later for MRSA infection. At time of his original presentation he was having ataxia as well as nausea and vomiting; though the shunt was removed after the fenestration, he said that he felt well from a neurological perspective. He continued's doing well for many years following the cyst fenestration.

SEKERKE, KEITH WAYNE - 20213286 (181652841)

However, approximately eight months ago he began having recrudescence of his symptoms.  He states that he began having intermittent whole head headaches that do not bother him, dysequilibrium at rest with a sensation of falling to the left, and rare nausea/vomiting.   He has had no vital sign changes or loss of consciousness.  He notes no memory difficulty.  He denies urinary incontinence but reports "fecal incontinence" which on further questioning is rare spotting on underwear; he notes no frank incontinence and does not wear diapers.  No falls.

Of note, pt complains of considerable neck pain secondary to reported "nonoperative" cervical stenosis, and requests that this provider instruct the prison to increase his pain medication regimen.
**- No acute neurosurgical intervention**
**- Repeat CTH**
**- Follow up neurology for large volume LP with opening pressure**
- Follow up primary care for pain management

**Recent emergency department encounters or hospitalizations:** Denies

The ASCVD Risk score (Goff DC Jr., et al., 2013) failed to calculate for the following reasons:
Cannot find a previous HDL lab
Cannot find a previous total cholesterol lab

**Past Medical History:**
Patient Active Problem List
Diagnosis
  • History of ventricular shunt
  • Ingestion of foreign body
  • Spinal stenosis
- Hx posterior fossa cyst
- MRSA of VP shunt (2008)

I reviewed and verified the medications as listed below:

Current Outpatient Medications:
• Acetaminophen (APAP EXTRA STRENGTH PO), Take 500 mg by mouth 2 times daily as needed. , Disp: , Rfl:
• acetaZOLAMIDE (DIAMOX) 250 MG tablet, Take 250 mg by mouth 2 times daily., Disp: , Rfl:
• buPROPion (WELLBUTRIN SR) 150 MG SR tablet, Take 150 mg by mouth 2 times daily., Disp: , Rfl:
• buPROPion (WELLBUTRIN) 100 MG tablet, Take 100 mg by mouth daily. Take 100mg by mouth at noon., Disp: , Rfl:
• busPIRone (BUSPAR) 15 MG tablet, Take 20 mg by mouth 2 times daily. , Disp: , Rfl:
• CHLORPROMAZINE HCL PO, Take 100 mg by mouth at bedtime. , Disp: , Rfl:
• diphenhydrAMINE (BENADRYL) 50 MG capsule, Take 50 mg by mouth 2 times daily as needed for Itching. , Disp: , Rfl:
• ibuprofen (MOTRIN IB) 200 MG capsule, Take 400 mg by mouth 2 times daily as needed for Mild Pain (Pain Score 1-3). , Disp: , Rfl:
• omeprazole (PRILOSEC) 20 MG capsule, Take 20 mg by mouth daily., Disp: , Rfl:
• Oxcarbazepine (TRILEPTAL) 300 MG tablet, Take 300 mg by mouth daily. Give in addition to 600mg PO QA for a total of 900mg PO QAM, Disp: , Rfl:
• Oxcarbazepine (TRILEPTAL) 600 MG tablet, Take 600 mg by mouth daily., Disp: , Rfl:
• pregabalin (LYRICA) 150 MG capsule, Take 1 capsule (150 mg) by mouth 2 times daily., Disp: 60 capsule, Rfl: 1
• traMADol (ULTRAM) 50 MG tablet, Take 1 tablet (50 mg) by mouth every 8 hours as needed for Moderate Pain (Pain Score 4-6) (Neck pain)., Disp: 90 tablet, Rfl: 0

**Social/Family History:**
I reviewed and verified the social and family history as listed below:
Social History

Tobacco Use
  • Smoking status:          Former Smoker

- Smokeless tobacco:                  Never Used
Substance Use Topics
- Alcohol use:                        No
- Drug use:                           Not on file

No family history on file.

**Review of Systems:**
I reviewed the ROS documented by MD Hirshman in the note dated on 2/28/2020. Except as documented (above in HPI) and in the referring provider's note, all other systems were reviewed and were negative.

**I reviewed and confirmed the pertinent examination findings below:**
Vital signs today are: Blood pressure (!) 146/96, pulse 98, temperature 98.3 °F (36.8 °C), temperature source Oral, resp. rate 18, height 5' 10" (1.778 m), weight 88.9 kg (196 lb), SpO2 96 %.
I reviewed the physical exam documented by MD Hirshman in the note dated on 2/28/2020.

General: Patient is well developed, in no acute distress.
HEENT: Wearing eyeglasses. Normocephalic & atraumatic. No lymphadenopathy.
CV: Regular rate & rhythm. No murmurs or carotid bruits.
Lungs: Clear to auscultation anteriorly bilaterally.
Abdomen: +bowel sounds. Non- tender.
Extremities: No clubbing, cyanosis, or edema.
Skin: No rashes, no distal trophic changes.

**I reviewed and confirmed the pertinent neurological examination findings below:**
Mental Status: alert, oriented to time, place, and person; intact general fund of knowledge; normal recent and remote memory; normal attention span and concentration; normal language function.
Cranial Nerves: visual fields intact to confrontation, fundi benign; pupils 4mm, round, normally reactive to light; extraocular movements full and conjugate, no pathologic nystagmus; facial sensation full and symmetric to light touch and pin; facial movement full and symmetric; hearing intact to conversation and to rubbed fingers bilaterally; palate and tongue movement full and symmetric; palatal sensation intact; shoulder shrug full and symmetric; normal tongue protrusion.
Motor: Pain with neck flexion, extension, lateral rotation/flexion of neck. 5- give way strength d/t pain to LUE otherwise normal muscle strength and tone in RUE and lower extremities; normal bulk throughout; no pronator drift or orbiting.
Cerebellar/Coordination: normal rapid alternating movements, finger-to-nose, heel-to-shin; mild no postural tremor; no evidence of parkinsonism.
Sensory: decreased sensation to pinprick to C5/C6 dermatome of the LUE. Increased sensitivity to palpation of the ulnar nerve at the left elbow. Decreased vibratory sensation to bilateral great toes (8-9 seconds). Intact to light touch, proprioception; no extinction to double simultaneous stimulation; normal graphesthesia.
Reflexes: normal, 2+, symmetric throughout upper and lower extremities; no ankle clonus; toes downgoing to plantar stimulation bilaterally
Station/Gait: normal toe and heel walking; fair tandem
Romberg- sway, "on the boat" sensation elicited

**I personally reviewed the following results of ancillary testing:**
**Lab Results**

| Component | Value | Date |
| --- | --- | --- |
| CA | 9.2 | 05/16/2019 |
| MG | 2.0 | 04/16/2008 |
| PHOS | 3.0 | 04/16/2008 |
| TBILI | <0.15 | 05/16/2019 |
| DBILI | 0.2 | 04/16/2008 |
| AST | 35 | 05/16/2019 |
| ALT | 68 (H) | 05/16/2019 |
| ALB | 4.4 | 05/16/2019 |

No components found for: SPEP, EPG, IMMUNOFIX
**Lab Results**

| Component | Value | Date |
| --- | --- | --- |

SEKERKE, KEITH WAYNE  700015199 (18165284)

| WBC | 9.9 | 05/16/2019 |
| HGB | 15.2 | 05/16/2019 |
| HCT | 43.5 | 05/16/2019 |
| PLT | 207 | 05/16/2019 |
| PLT | 252 | 04/24/2010 |

**I independently reviewed MRI/CT/other scan:**

CT Head w/o contrast 4/17/20:
Essentially unchanged head CT compared to 9/12/2018 with stable postsurgical changes related to a left partial occipital craniectomy, presumably the basis of posterior fossa cyst decompression/fenestration, with similar distribution of encephalomalacia-gliosis of the left medial and inferior cerebellar hemisphere. Ventricular sizes are unchanged without evidence of interval ventriculomegaly or other signs to suggest decompensated hydrocephalus by CT.
No acute intracranial hemorrhage, mass effect, midline shift, hydrocephalus or herniation.

CT C-spine w/o contrast 12/9/18:
No acute osseous abnormality of the cervical spine.

**Impressions:**
No concerning signs or symptoms of a recurrent hydrocephalus; CT head was negative. Will defer performing large volume LP. Left arm weakness with give way strength most noticeable at the shoulder level in addition to hypoesthesia to pinprick to left forearm. Will place orders for EMG and MRI C-spine to evaluate for cervical radiculopathy. Probable occipital neuralgia, will place orders for physical therapy and pain clinic to evaluate for nerve block.

**Problem List Items Addressed This Visit**
None

**Visit Diagnoses**
  **Neck pain**   - Primary
    Relevant Medications
      pregabalin (LYRICA) 150 MG capsule
      traMADol (ULTRAM) 50 MG tablet

    Other Relevant Orders
      Physical Therapy - Outside (Non-UCSD)

  **Chronic left shoulder pain**
    Relevant Medications
      pregabalin (LYRICA) 150 MG capsule
      traMADol (ULTRAM) 50 MG tablet

    Other Relevant Orders
      EMG/NCS Service Request - Neurology
      Physical Therapy - Outside (Non-UCSD)

  **Occipital neuralgia of left side**
    Relevant Orders
      Consult/Referral to Pain Clinic

  **Cervical radiculopathy**
    Relevant Orders
      MRI Neck Soft Tissue W/O Contrast
      EMG/NCS Service Request - Neurology

*Counseling provided:*
*patient and family education: orders for EMG, MRI C-spine, pain clinic, PT*
*Diagnostic test results- reviewed CT Head*
    SEKERKE, KEITH WAYNE  700015199 (18165284)

*Treatment options (risks and benefits)- increase Lyrica dosage to 150mg BID; 50mg Tramadol three times daily PRN*
*Instructions for management*
*Prognosis is good to maintain current level of functioning.*
*Advised on daily exercise*

Comorbidities contributing to the compexity of decision making and management include: prior hydrocephalus, neck pain, shoulder pain/weakness

**Recommendations and Plan:**
# Possible cervical radiculopathy
- MRI C-spine
- EMG

# Probable occipital neuralgia
- Pain clinic referral to evaluate for nerve block

# Chronic neck and shoulder pain
- Increase Lyrica to 150mg two times a day
- Tramadol 50mg three times a day PRN for moderate-severe pain
- PT referral

# Follow up
- PRN

Copies of this note will be sent to the referring provider and others involved in the care of this patient.
I spent 60 minutes face-to-face interviewing, examining and counseling the patient

## Instructions

Please provide the pt with physical therapy for his left shoulder weakness

Please schedule an appointment for an MRI of your neck

Please schedule an appointment to have an EMG of your left shoulder done

After Visit Summary (Printed 4/20/2020)

## Additional Documentation

Vitals:  BP **146/96** ❗ (BP Location: Left arm, BP Patient Position: Sitting, BP cuff size: Regular) Pulse 98
Temp 98.3 °F (36.8 °C) (Oral) Resp 18 Ht 5' 10" (1.778 m) Wt 88.9 kg (196 lb) SpO2 96% BMI 28.12 kg/m²
BSA 2.1 m²
Flowsheets:  Recent Travel, Pain, Travel, Fall, Exam Room
Encounter Info:  Billing Info, History, Allergies, Detailed Report

## Communications

 Letter sent to Central Jail-San Diego
Sent 4/21/2020

## Orders Placed

⚕ MRI Cervical Spine W/O Contrast
Consult/Referral to Pain Clinic
EMG/NCS Service Request - Neurology
Physical Therapy - Outside (Non-UCSD)
SEKERKE, KEITH WAYNE  700015199 (18165284)

## Medication Changes

✚ traMADol HCl 50 mg Oral EVERY 8 HOURS PRN
△ Pregabalin 150 mg Oral 2 TIMES DAILY *No dose, route, or frequency recorded.*
✖ *Albuterol 2 PFU EVERY 4 HOURS PRN* (Pt No Longer Taking)
✖ *Amoxicillin 500 mg 2 TIMES DAILY* (Pt No Longer Taking)
✖ *Beclomethasone Dipropionate 40 MCG/ACT 2 puffs 2 TIMES DAILY* (Pt No Longer Taking)
✖ *chlorproMAZINE HCl 100 mg Oral AT BEDTIME*
✖ *Citalopram Hydrobromide 20 mg DAILY* (Pt No Longer Taking)
✖ *Gabapentin 400 mg 2 TIMES DAILY* (Pt No Longer Taking)
✖ *HYDROcodone-Acetaminophen 5-500 MG 1 tablet EVERY 6 HOURS PRN* (Pt No Longer Taking)
✖ *Prazosin HCl 1 mg Oral NIGHTLY* (Pt No Longer Taking)

## Visit Diagnoses

◈ Hydrocephalus, unspecified type (CMS-HCC) G91.9
Cervical radiculopathy M54.12
Occipital neuralgia of left side M54.81
Neck pain M54.2
Chronic left shoulder pain M25.512, G89.29

Printed by Rose, Maria M. at 5/6/20 10:59 AM

SEKERKE, KEITH WAYNE  700015199 (18165284)

# EXHIBIT  E

Description of this Exhibit  *Shows what "Neuralgia"*
*means.*
*Besically it means PAIN*

Number of Pages  _____

**MENU**

AANS  ›  **Patients**  ›  **Neurosurgical Conditions and Treatments**  ›  Occipital Neuralgia

# Occipital Neuralgia

Occipital Neuralgia is a condition in which the occipital nerves, the nerves that run through the scalp, are injured or inflamed. This causes headaches that feel like severe piercing, throbbing or shock-like pain in the upper neck, back of the head or behind the ears.

## Causes



Occipital neuralgia can be the result of pinched nerves or muscle tightness in the neck. It can also be caused by a head or neck injury. Occipital neuralgia can either be primary or secondary. A secondary condition is associated with an underlying disease.

Although any of the following may be causes of occipital neuralgia, many cases can be attributed to chronic neck tension or unknown origins.

- Osteoarthritis of the upper cervical spine
- Trauma to the greater and/or lesser occipital nerves
- Compression of the greater and/or lesser occipital nerves or C2 and/or C3 nerve roots from degenerative cervical spine changes
- Cervical disc disease
- Tumors affecting the C2 and C3 nerve roots
- Gout
- Diabetes
- Blood vessel inflammation
- Infection

## Symptoms

Symptoms of occipital neuralgia include continuous aching, burning and throbbing, with intermittent shocking or shooting pain that generally starts at the base of the head and goes to the scalp on one or both sides of the head. Patients often have pain behind the eye of the affected side of the head. Additionally, a movement as light as brushing hair may trigger pain. The pain is often described as migraine-like and some patients may also experience symptoms common to migraines and cluster headaches.

Your contribution can help

# Fund Neurosurgical Research While You Shop

SIGN UP NOW        LEARN ABOUT NREF

# When & How to Seek Medical Care

Occipital neuralgia can be very difficult to diagnose because of its similarities with migraines and other headache disorders. Therefore, it is important to seek medical care when you begin feeling unusual, sharp pain in the neck or scalp and the pain is not accompanied by nausea or light sensitivity. Begin by addressing the problem with your primary care physician. They may refer you to a specialist.

# Testing & Diagnosis

Diagnosis of occipital neuralgia is tricky, because there is not one concrete test that will reveal a positive or negative diagnosis. Typically, a physical examination and neurological exam will be done to look for abnormalities. If the physical and neurological exams are inconclusive, a doctor may order further imaging to rule out any other possible causes of the pain. A magnetic resonance imaging (MRI) test may be ordered, which can show three-dimensional images of certain body structures and can reveal any impingement. A computed tomography scan (CT or CAT scan) will show the shape and size of body structures. Some doctors may use occipital nerve blocks to confirm their diagnosis.

# Treatment

Treatment of occipital neuralgia aims to alleviate the pain; however, it is not a cure. Interventions can be surgical or non-surgical.

# Non-surgical Treatments

- Heat: patients often feel relief when heating pads or devices are placed in the location of the pain. Such heating pads can be bought over-the-counter or online.
- Physical therapy or massage therapy.
- Oral Medication:
  - Anti-inflammatory medications;
  - Muscle relaxants; and
  - Anticonvulsant medications.

- Percutaneous nerve blocks- these injections can be used/both to diagnose and treat occipital neuralgia.
- Botulinum Toxin (Botox) Injections: Botox injections can be used to decrease inflammation of the nerve

# Surgery

- Occipital Nerve Stimulation: This surgical treatment involves the placement of electrodes under the skin near the occipital nerves. The procedure works the same way as spinal cord stimulation and uses the same device. The procedure is minimally invasive and surrounding nerves and structures are not damaged by the stimulation. It is an off-label indication for an FDA-approved device.

- Spinal Cord Stimulation: this surgical treatment involves the placement of stimulating electrodes between the spinal cord and the vertebrae. The device produces electrical impulses to block pain messages from the spinal cord to the brain.
- C2,3 Ganglionectomy- This treatment involves the disruption of the second and third cervical sensory dorsal root ganglion. Acar et al (2008) studied the short-term and long-term effects of this procedure. The study found that 95% of patients had immediate relief with 60% maintaining relief past one year.

# Follow-up

Patients are encouraged to regularly follow up with their primary care providers and specialists to maintain their treatment. Surgeons like patients to return to the clinic every few months in the year following the surgery. In these visits, they may adjust the stimulation settings and assess the patient's recovery from surgery. Following up with a doctor ensures that the patient is getting correct and effective care. Patients who undergo occipital nerve stimulation will follow up with a device representative who will adjust their device settings and parameters as needed, alongside their doctors.

# Outlook/Latest Research

Currently Recruiting:

- Evaluation of Occipital Nerve Stimulation in Intractable Occipital Neuralgias
- Ultrasound Guided Platelet Rich Plasma Injections for Post Traumatic Greater Occipital Neuraliga
- A Comparison of Dexamethasone and Triamcinolone for Ultrasound-guided Occipital C2 Nerve Blocks
- A Prospective Controlled Treatment Trial for Post-Traumatic Headaches

Recently Published:

- Sweet, J. A., Mitchell, L. S., Narouze, S., Sharan, A. D., Falowski, S. M., Schwalb, J. M., ... Pilitsis, J. G. (2015). Occipital Nerve Stimulation for the Treatment of Patients With Medically Refractory

Occipital Neuralgia. *Neurosurgery, 77*(3), 332–341. doi: 10.1227/neu.0000000000000872J This systematic review compiles treatment recommendations for the use of occipital nerve stimulation to treat occipital neuralgia. The review found various articles supporting these recommendaitons.

- Janjua, M. B., Reddy, S., Ahmadieh, T. Y. E., Ban, V. S., Ozturk, A. K., Hwang, S. W., ... Arlet, V. (2020). Occipital neuralgia: A neurosurgical perspective. *Journal of Clinical Neuroscience, 71*, 263–270. doi: 10.1016/j.jocn.2019.08.102 This paper investigates the different causes of occipital neuralgia and surgical interventions that have aided in relieving pain. The paper also provides case examples for each cause and corresponding treatment. The paper found that the C2 nerve is the most common site for compression causing the pain. Treatments such as C2 neurectomy and/or ganglionectomy offer the most pain relief for patients.

- Texakalidis, P., Tora, M. S., Nagarajan, P., Jr, O. P. K., & Boulis, N. (2019). High cervical spinal cord stimulation for occipital neuralgia: a case series and literature review. *Journal of Pain Research, Volume 12*, 2547–2553. doi: 10.2147/jpr.s214314P This study uses a literature review to support the author's personal experiences treating occipital neuralgia with spinal cord sitmulation to show the efficacy of the treatment for this condition. The study found that high cervical spinal cord stimulation results in 40-50% success in patients with occipital neuralgia and thus, spinal cord stimulation may be considered as a treatment option.

# Resources for More Information

- Amy's Occipital Neuralgia Story
- Michael's Story

# Author Information

Patient Pages are authored by neurosurgical professionals, with the goal of providing useful information to the public.

Julie G Pilitsis, MD, PhD, FAANS
Chair, Neuroscience & Experimental Therapeutics
Professor, Neurosurgery and Neuroscience & Experimental Therapeutics
Albany Medical College
Dr. Pilitsis specializes in neuromodulation with research interests in treatments for movement disorders and chronic pain.

Olga Khazen, BS
Research Coordinator
Neuroscience & Experimental Therapeutics
Albany Medical College

*The AANS does not endorse any treatments, procedures, products or physicians referenced in these patient fact sheets. This information provided is an educational service and is not intended to serve as medical advice. Anyone seeking specific neurosurgical advice or assistance should consult his or her neurosurgeon, or locate one in your*

UNITED STATES DISTRICT COURT
Southern DISTRICT OF CALIFORNIA

Keith SeKerke

v.

Adam Arkwright

et al

Case Number: 20-cv-
1045-JO-~~AHG~~ ASG

PROOF OF SERVICE

I hereby certify that on _January 18, 2023_, I served a copy

of the attached _Motion to reopen discovery and Appoint expert_

by placing a copy in a postage paid envelope addressed to the person(s) hereinafter

listed, by depositing said envelope in the United States Mail at

_Valley State Prison_ : addressed as follows:

(List Name and Address of Each
Defendant or Attorney Served)

U.S. District Court
333 West Broadway Suite 420
San Diego CA 92101

I declare under penalty of perjury that the foregoing is true and correct.

_Keith SeKerKe_
(Signature of Person Completing Service)

Keith Sekerke BP1899
USP B1-32-34
P.O. Box 92
Chowchilla, CA 93610

U.S. DISTRICT COURT
333 West Broadway, Suite 420
San Diego, CA 92101

